[No. S136294. Feb. 16, 2006.]

EDWARD J. COSTA et al., Petitioners, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
BILL LOCKYER et al., Real Parties in Interest.

## COUNSEL

Gibson, Dunn & Crutcher, Daniel M. Kolkey, G. Charles Nierlich and Rebecca Justice Lazarus for Petitioners.

No appearance for Respondent.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, James M. Humes, Chief Assistant Attorney General, Louis R. Mauro, Assistant Attorney General, Richard M. Frank, Chief Deputy Attorney General, Christopher E. Krueger, Leslie R. Lopez, Douglas J. Woods, Zackery P. Morazzini, Vickie P. Whitney and Susan K. Leach, Deputy Attorneys General, for Real Party in Interest Bill Lockyer.

Olson, Hagel & Fishburn, Deborah B. Caplan, Lance H. Olson and Richard C. Miadich for Real Party in Interest Californians for Fair Representation—No on 77.

Knox, Lemmon and Anapolsky, Thomas S. Knox, Angela Schrimp de La Vergne and Glen C. Hansen for Real Party in Interest Bruce McPherson, Secretary of State.

Linda A. Cabatic for Real Party in Interest Geoff Brandt, Acting State Printer for the State of California.

## OPINION

**GEORGE, C. J.**—This case arises from a legal challenge to Proposition 77, an initiative measure that was submitted to California voters at the November 8, 2005, special statewide election. The underlying challenge to the measure was brought after circulation of the initiative petition was completed but prior to the Secretary of State's submission of the ballot pamphlet materials to the State Printer, and sought to have the measure withheld from the ballot because of several differences between the version of the measure that was submitted to the Attorney General prior to the circulation of the initiative petition, and the version printed on the petition that subsequently was circulated for signature. The trial court and the Court of Appeal (in a two-to-one decision) concluded that the discrepancies between the two versions warranted withholding the measure from the ballot, but this court, acting on an expedited basis prior to the Secretary of State's submission of the ballot pamphlet materials to the printer, granted review, determined that the discrepancies in question did not justify withholding the measure from the ballot, and directed the Secretary of State to include in the ballot pamphlet and on the election ballot the version of the measure that had been circulated for signature and signed by the requisite number of qualified voters. Our order granting review also stated that we would determine after the election whether to retain jurisdiction in this matter and resolve, by a full opinion, the issues presented.

At the November 8, 2005, election, the voters rejected Proposition 77. Although the defeat of Proposition 77 renders moot the legal challenge to the measure, we nonetheless have concluded that we should retain this matter and issue an opinion in order to provide guidance for future cases, both with regard to the procedural question whether preelection review of this type of challenge to an initiative measure is appropriate and with regard to the substantive legal standard that is applicable in determining whether the type of discrepancy that was involved in this case warrants withholding an initiative measure from the ballot.

## I

We begin with a summary of the principal features of Proposition 77, and then describe the events that resulted in the discrepancy between the version of the initiative measure that was submitted to the Attorney General and the version that was circulated for signature.

## A

During 2004, petitioner Edward J. Costa, the Chief Executive Officer of People's Advocate, Inc., submitted to the Attorney General, for preparation of

a title and summary, several alternative initiative measures involving proposed changes in the redistricting process (that is, the procedure for adjusting the boundaries of election districts), including the initiative measure at issue in the present case.[1]

The initiative measure here at issue—the one that, after certification, was designated Proposition 77 on the November 8, 2005, election ballot—proposed to amend the California Constitution to transfer the power to draw election districts from the Legislature to a three-member panel of retired federal and/or state judges, who would act as special masters in developing redistricting plans for elections to the state Senate and Assembly, the Board of Equalization, and California congressional districts of the United States House of Representatives. The measure proposed the addition of new substantive criteria that the special masters would be required to follow in formulating redistricting plans, including (1) with regard to state legislative and Board of Equalization districts, a requirement that the population differences among the districts not exceed 1 percent; (2) a requirement that Senate districts be comprised of two adjacent Assembly districts, and Board of Equalization districts be comprised of 10 adjacent Senate districts; (3) a directive that all redistricting plans minimize the splitting of counties and cities into multiple districts; and (4) a limitation precluding the special masters, in drawing boundaries, from considering information relating to voters' political party affiliation. (Cal. Const., proposed art. XXI, § 2, subds. (a)–(i).)

The measure also set forth a detailed procedure to govern the selection of the special masters. It directed the Judicial Council—the constitutional entity charged with the administration of the judicial branch (Cal. Const., art. VI, § 6)—to compile a pool of retired federal and state judges eligible and willing to serve on the panel,[2] and then randomly to select from the pool a list of 24 judges, with the requirement that judges affiliated with the two largest political parties be equally represented on the list. Thereafter, each of the four state legislative leaders of the Senate and the Assembly (two from the majority party and two from the minority party) was to nominate (from the 24-judge list) three judges who were not members of the same political party as the

---

[1] The record indicates that prior to the December 7, 2004, submission of the measure here at issue, Costa earlier in the year submitted three different proposed redistricting measures to the Attorney General for preparation of a title and summary—one on April 8, 2004, one on May 13, 2004, and one on October 5, 2004.

[2] Under the measure, a retired judge was ineligible to serve as a special master if he or she had held partisan political office, changed his or her party affiliation after being appointed to the bench, or received income over the past year from specified political sources. In addition, if selected to serve as a special master, the retired judge was required to pledge not to run for office in any of the districts created and not to accept, for at least five years, state public employment (other than judicial employment or a teaching position). (Cal. Const., proposed art. XXI, § 1, subd. (c), par. (2), subpars. (A)–(B).)

leader making the nomination—creating a new list of 12 nominees. (No retired judge could be nominated by more than one legislator.) Each of the legislative leaders then was authorized to exercise one peremptory challenge against a judge who had been nominated by one of the other legislative leaders, leaving a list of at least eight nominees. Ultimately, from this reduced list, three judges (including at least one from each of the two largest political parties) were to be chosen by lot to serve as the three-judge special master panel. (Cal. Const., proposed art. XXI, § 1, subd. (c), par. (2), subpars. (A)–(F).)

The measure also provided that in devising the redistricting plans, the special masters would be required to hold at least three public hearings, including one hearing after the special masters' initial proposed plan had been submitted to the Legislature for comment. Under the proposition, the final redistricting plans for the state Senate and Assembly, Board of Equalization, and the California congressional districts were to be approved by a single resolution adopted unanimously by the three-judge panel that would become effective immediately upon filing with the Secretary of State; the districts created by the special masters' resolution were to be used for the next statewide primary and general elections. The measure also provided that the redistricting plans created by the special masters were to be submitted to the voters at the next general election, and, if approved by the voters, the districts embodied in those plans were to continue to be used until new redistricting plans were drawn following the next decennial census. If the plans were rejected by the voters at the general election, officials elected under the rejected plans nonetheless were authorized to serve full terms, but the redistricting process was to begin again and new districts were to be prepared for use in subsequent elections. (Cal. Const., proposed art. XXI, § 1, subds. (f)-(*i*).)

Finally, the measure provided that the initial redistricting process under the new procedure was to begin immediately upon the voters' approval of the measure, with the selection of the three-judge special master panel to be completed within 20 days of the adoption of the measure and the panel charged with establishing a schedule and deadlines to ensure timely adoption of new districts for use at the 2006 statewide primary and general elections. (Cal. Const., proposed art. XXI, § 1, subd. (b).)

### B

Both versions of the initiative measure that are at issue in this case contained all of the features described *ante*. As we shall explain, although there were some substantive differences in the two versions in question, the differences were minor in relation to the initiative measure as a whole. Because the events that resulted in the discrepancy are relevant to the resolution of the issue before us, we set forth those events in some detail.

On Friday, December 3, 2004, Daniel M. Kolkey, an attorney who had been retained by Costa to assist in drafting the redistricting initiative at issue, sent an e-mail message to Costa and others, attaching Kolkey's then most current draft of the proposed initiative measure. (For convenience, we shall refer to this draft as the December 3 version.) As we subsequently observe, the December 3 version is the one that ultimately was set forth in the petition that was circulated for signature and signed by the required number of eligible voters, was printed in the ballot pamphlet, and was submitted to the voters at the November 8, 2005, election.

On Monday, December 6, 2004, Kolkey edited the December 3 version, making a number of changes—both stylistic and substantive—which are set forth in full in an appendix to this opinion. (We shall refer to this version as the December 6 version.) The most significant of the changes made by Kolkey on December 6 involved (1) a substantial revision of the wording of the introductory section of the initiative setting forth "Findings and Declarations of Purpose" (see appen., *post*, pp. 1040–1041), (2) a one-day reduction in the time periods in which the legislative leaders were to make their nominations and exercise their peremptory challenges in creating the final list of judges from which the special masters were to be chosen by lot (see appen., *post*, p. 1042), and (3) an explicit statement that, with regard to the redistricting process, the initiative and referendum power was to be used only in the manner specified in the initiative measure (see appen., *post*, p. 1045).[3] On Monday evening, December 6, 2004, Kolkey sent the December 6 version of the initiative measure to Costa by e-mail.

Emily Adams, the office manager, secretary, and receptionist for People's Advocate, Inc., was responsible for organizing and keeping track of the various versions of the initiatives on which Costa was working that had been directed to her attention. Adams's practice was to label each version provided to her, retain it in electronic format, and mark all final versions as such. On Tuesday, December 7, 2004, Adams prepared for Costa's signature a cover letter to accompany the submission to the Attorney General of the initiative measure here at issue. When the letter was sent to the Attorney General on that same day, it contained the December 6 version of the proposed initiative.

Tricia Knight, the initiative coordinator for the Attorney General, received the letter from Costa with the December 6 version of the proposed initiative

---

[3] Other revisions made in the December 6 version included a number of stylistic changes—including changing the words "nominate" to "select" (appen., *post*, p. 1042), "selected" to "appointed" (appen., *post*, p. 1042), and "provided for" to "as specified" (appen., *post*, p. 1044)—and a revision of the wording of one sentence dealing with the procedure to be utilized should the final drawing by lot fail to include at least one special master from each of the two largest political parties. (Appen., *post*, p. 1043.)

on December 7, 2004, and replied to Costa that same day, acknowledging receipt of the submission and explaining that the Attorney General's office had sent copies of the proposed initiative to the Legislative Analyst and the Department of Finance for an estimate of fiscal impact, and that these entities had 25 days in which to return the estimate. Knight's letter stated that after the estimate was returned by these entities, the Attorney General would supply a title and summary within 15 days. The letter also advised Costa that any substantive amendments to the submitted proposed initiative measure could be accepted by the Attorney General only on or before December 22, 2004 (that is, within 15 days of the proponents' initial submission of the measure), and that after that date any substantive amendment would have to be submitted as a new measure and the process would have to begin anew.

On January 28, 2005, the Attorney General received a letter from Costa adding the names of three additional persons as proponents of the proposed initiative measure at issue. Like the December 7 letter from Costa, this letter also attached the December 6 version of the proposed initiative.

On February 3, 2005, after the Attorney General's office had completed its preparation of the title and summary of the measure, Knight sent copies of them and the December 6 version of the measure to Costa and the other proponents, and to the Secretary of State, the Chief Clerk of the Assembly, and the Secretary of the Senate.

At some point after his submission of the measure to the Attorney General on December 7, 2004, but prior to his receipt of the Attorney General's title and summary, Costa decided to have the text of the proposed initiative measure prepared for printing in order to expedite the commencement of the circulation of the initiative petitions. In a declaration filed in the underlying proceeding, Costa explained that he was concerned about fitting the text of the entire initiative on the back of a reasonably sized petition section,[4] and wanted to have the measure laid out as completely as possible before receiving the Attorney General's title and summary. To this end, Costa directed Adams to provide a copy of the initiative to Heath Norton, the People's Advocate's computer expert, who was to format the measure for submission for printing. Adams downloaded onto a floppy disk the file on her

---

[4] A "petition section" is the document that is circulated to eligible voters for signature. (Elec. Code, § 9020.) Elections Code section 9014 provides that "[a]ny initiative or referendum petition may be presented in sections, but each section shall contain a full and correct copy of the title and text of the proposed measure. The text of the measure shall be printed in type not smaller than 8 point." Elections Code section 9030, subdivision (a) further provides that "[e]ach section of the petition shall be filed with the elections official of the county or city and county in which it was circulated, but all sections circulated in any county or city and county shall be filed at the same time."

Unless otherwise indicated, all further statutory references are to the Elections Code.

computer labeled "Dec[ember] Submission Final" and gave the disk to Norton. Although Adams was unaware of this circumstance at the time, the version that she downloaded onto the floppy disk actually was the December 3 version of the proposed initiative, not the December 6 version.[5] Norton used the version on the floppy disk to prepare a mockup of the petition.

Once Costa received the Attorney General's title and summary for the proposed initiative at the beginning of February 2005, Costa directed Norton to add the title and summary to the formatted petition and send it to the printer. Norton did so, and the petition sections were printed using the December 3 version of the initiative measure. During the next three months, the petition sections were circulated to the public for signature, and from May 5 to May 10, 2005, signed sections of the petition were submitted to local election officials throughout the state for certification. In all, more than 950,000 individuals signed the circulated petition.

Sometime in mid-May 2005, after the petitions had been submitted to local election officials but before the measure had been certified for the ballot by the Secretary of State, Costa and Kolkey learned that the text of the initiative measure on the circulated petitions was the December 3 version of the measure and not the December 6 version that had been submitted to the Attorney General. After this discovery, Kolkey reviewed the differences in the two measures and conducted legal research on the matter, but neither he, Costa, nor anyone else immediately revealed the discrepancy either to the Secretary of State or to the Attorney General.

On June 10, 2005, the Secretary of State certified that the proposed initiative measure had been signed by a sufficient number of qualified voters to qualify for the ballot, and sent letters to the Chief Clerk of the Assembly and the Secretary of the Senate, pursuant to section 9034, notifying the Legislature that the initiative had qualified for the ballot.[6] In transmitting copies of the initiative measure to the Senate and the Assembly, as required by

---

[5] When Adams later learned of this circumstance, she reviewed all her computer files and found that she did not have the December 6 version in electronic format. There is nothing in the record that further explains the discrepancy.

[6] Although neither the trial court nor the Court of Appeal questioned whether the measure had obtained the requisite number of signatures to qualify for the ballot, real party in interest Californians For Fair Representation—No on 77 (hereafter CFFR)—the party representing the opponents of the measure—contests this point, noting that during the early stages of the certification process several county election officials discovered that some of the petition sections that were submitted in support of this measure actually were petition sections for one or more of the other redistricting measures that Costa earlier had submitted to the Attorney General for title and summary. (See p. 995, fn. 1, *ante.*) As soon as this problem was discovered, however, the Secretary of State notified the local election official in each county to review carefully the petition sections that had been submitted in support of this measure before performing the raw count, and to return to the proponents all petition sections that did not

section 9034, the Secretary of State transmitted the December 6 version of the initiative that had been submitted to the Attorney General.

On June 12, 2005, Kolkey asked to meet with Undersecretary of State William P. Wood about the initiative measure. On June 13, 2005, Kolkey and Peter Siggins (who was then the Governor's Legal Affairs Secretary) met with Wood and disclosed the problem concerning the two versions of the initiative measure. Kolkey gave Wood a lengthy memorandum, dated June 10, 2005, setting forth a detailed legal argument supporting the view that, notwithstanding the discrepancy in the two versions, the version of the proposed initiative measure that had been circulated for signature and signed by the requisite number of qualified voters should be placed on the ballot.

On June 23, 2005, the Attorney General received a letter from Costa asking the Attorney General to reissue for the ballot pamphlet the same ballot title and summary that he had prepared for the proposed initiative measure on February 3, 2005.[7] The June 23 letter from Costa to the Attorney General made no mention of the problem concerning the two versions of the text.

On July 1, 2005, the Secretary of State delivered a letter to the Attorney General, advising him that "[a] situation has come to the attention of the Secretary of State's office concerning an initiative . . . given the title 'Reapportionment Initiative Constitutional Amendment' by your office," and explaining that the text of the initiative set forth in the circulated petition differed from the text that had been submitted to the Attorney General for the preparation of a title and summary. The letter asked for the Attorney General's guidance "whether the Secretary of State has the authority to make a determination which version of the text of a measure should be placed before the voters." The Secretary of State included with the letter a copy of the legal memorandum that had been prepared by Kolkey and given to the Secretary of State on June 13.

---

contain the title ("Reapportionment. Initiative Constitutional Amendment") that was appended to the initiative petition here at issue. Nothing suggests that the county officials failed to follow this instruction. Further, although CFFR additionally complains that there is no proof that all of the initiative petitions with the correct title actually contained the text of the December 3 version, CFFR did not present any evidence below to support a contrary conclusion, and, as noted, neither the trial court nor the Court of Appeal purported to base its decision to withhold the measure from the ballot on this ground. Under these circumstances, we reject CFFR's contention that the lower court rulings should be sustained on the theory that the Secretary of State erred in certifying that the measure had obtained the requisite number of valid signatures to qualify for the ballot or that the matter should be remanded to permit a further factual inquiry into this question.

[7] Under section 9050, once it is determined that a measure is to be placed on the ballot, the Attorney General "shall provide and return to the Secretary of State a ballot title for each measure submitted to the voters of the whole state."

On July 6, 2005, the Attorney General informed the Secretary of State that he could not represent the Secretary of State in this matter. On July 7, 2005, in a letter to the Attorney General, the Secretary of State stated that he had "the constitutional duty to present to the voters of California the measures that have qualified to appear on the ballot by the signatures of the people" and that he intended to do so "unless directed to do otherwise by a court." The next day, on July 8, 2005, the Attorney General filed the underlying petition for writ of mandate in the superior court, seeking an order prohibiting the Secretary of State from placing either version of the initiative measure on the November 8, 2005, special election ballot.

The Attorney General took the position that because the version of the initiative measure circulated for signature differed from the version submitted to the Attorney General for title and summary, neither version properly qualified for the ballot. In response, the proponents of the measure argued that the discrepancy was inadvertent and that the differences between the two versions were minor and did not affect the accuracy of the title and summary prepared by the Attorney General. The proponents maintained that they should be found to have substantially complied with the applicable constitutional and statutory provisions.

On July 22, 2005, after expedited briefing and a hearing, the superior court entered judgment in favor of the Attorney General in the writ proceeding, directing the Secretary of State not to place any version of Proposition 77 on the ballot. Although the superior court expressly found that the discrepancy between the two versions was "the result of an inadvertent mistake," the court determined that "the purposes of the constitutional and statutory requirements at issue would be frustrated if the court were to apply the substantial compliance doctrine to excuse the clear defects in this situation."

On July 25, 2005, the proponents of Proposition 77 filed a petition for writ of mandate in the Court of Appeal, seeking to overturn the judgment rendered by the superior court and requesting a temporary stay to permit the Secretary of State to make the Proposition 77 materials available for public examination for the requisite period before the August 15, 2005, deadline for delivery of the ballot pamphlet to the State Printer. (§ 9092.)[8] The Court of Appeal that same day granted the requested temporary stay, and the Secretary of State's subsequent public display of the ballot pamphlet included both the December 3 and December 6 versions of the proposed initiative, with a notation that the matter was subject to further court order.

---

[8] Section 9092 provides in relevant part: "Not less than 20 days before he or she submits the copy for the ballot pamphlet to the State Printer, the Secretary of State shall make the copy available for public examination."

On July 27, 2005, the proponents filed a supplemental petition for writ of mandate, stating that the Secretary of State had requested the Attorney General to provide a title and summary for the December 3 version of the initiative measure that had been circulated for signature, but that the Attorney General had taken the position that he would not provide a ballot label or ballot title and summary for that version of the measure. The supplemental petition requested the Court of Appeal to direct the Attorney General to provide a ballot label and ballot title and summary for the December 3 version of the measure in order to avoid a claim of noncompliance with the requirements of section 9092 should the Court of Appeal determine that the December 3 version of the measure should be placed on the ballot.[9]

On Thursday, July 28, 2005, the Court of Appeal issued an alternative writ on the original petition, establishing an expedited briefing schedule and setting the matter for argument on August 5, 2005.

On Friday, July 29, 2005, after considering opposition from the Attorney General and CFFR (see p. 999, fn. 6, *ante*), the Court of Appeal issued a further order, directing the Attorney General to provide a ballot label and a title and summary for the December 3 version of the proposed measure that had been circulated for signature. Pursuant to that order, on Monday, August 1, 2005, the Attorney General submitted to the Court of Appeal a title and summary for the December 3 version. Although the title provided by the Attorney General for the December 3 version substituted the word "Redistricting" for "Reapportionment," the Attorney General acknowledged in the Court of Appeal that the substitution was made only to permit differentiation of the two versions of the title and summary; the summary provided by the Attorney General for the December 3 version did not vary in any material respect from the summary of the measure that the Attorney General had prepared for the December 6 version of the measure.[10] Although the new

---

[9] Earlier, on July 13, 2005, the manager of the Ballot Pamphlet and Initiatives Program of the Secretary of State's Elections Division had delivered a letter to the Office of Legislative Counsel as part of the ballot pamphlet preparation process, requesting the Legislative Counsel, pursuant to her duties under Elections Code section 9091, to prepare and proofread the December 3 version of the initiative measure that had been circulated for signature. Section 9091 provides: "The Legislative Counsel shall prepare and proofread the texts of all measures and the provisions which are repealed or revised."

[10] The title and summary prepared (on February 3, 2005) by the Attorney General for the December 6 version provided in full:

"REAPPORTIONMENT. INITIATIVE CONSTITUTIONAL AMENDMENT. Amends state Constitution's process for redistricting California's Senate, Assembly, Congressional and Board of Equalization districts. Requires three-member panel of retired judges, selected by legislative leaders, to adopt new redistricting plan if measure passes and again after each national census. Panel must consider legislative public proposals/comments and hold public hearings. Redistricting plan becomes effective immediately when adopted by judges' panel and filed with Secretary of State. If voters subsequently reject redistricting plan, process repeats. Specifies

summary submitted by the Attorney General to the Court of Appeal did not include an analysis of the fiscal impact of the measure, no party contends that the variations between the December 6 and December 3 versions would affect the estimate of the fiscal impact of the measure by the Legislative Analyst and the Department of Finance that was included in the Attorney General's initial summary.

The Court of Appeal heard oral argument on Friday, August 5, 2005, and issued its opinion on Tuesday, August 9, 2005. The majority opinion of the Court of Appeal, signed by two justices, concluded initially that, as a procedural matter, preelection resolution of the election-law challenge was permissible and was warranted in light of the nature of the challenge at issue in this case. Turning to the merits, the Court of Appeal majority concluded that in light of the discrepancies between the version of the proposed initiative measure submitted to the Attorney General and the version circulated for signature, the trial court correctly held that neither version should be submitted to the voters at the November 8, 2005, special election. A third Court of Appeal justice dissented, maintaining that preelection resolution of the challenge was not warranted, and further concluding that on the merits, the discrepancies between the two versions did not justify withholding from the ballot the version of the measure circulated for signature and signed by the requisite number of qualified voters.

The following day, Wednesday, August 10, 2005, the proponents of the proposition filed an emergency petition for review in this court, requesting immediate consideration and a stay of the trial court's order that prohibited the Secretary of State from taking any action to place Proposition 77 on the November 8, 2005, special election ballot. The petition for review noted that

---

time for judicial review of adopted redistricting plan; if plan fails to conform to requirements, court may order new plan. Summary of estimate by Legislative Analyst and Director of Finance of fiscal impact on state and local government: This measure would have the following major fiscal impact: One-time state redistricting costs, probably totaling a few million dollars. Comparable savings for each redistricting effort after 2010 (once every ten years)."

The title and summary prepared (on August 1, 2005) by the Attorney General for the December 3 version provided:

"REDISTRICTING. INITIATIVE CONSTITUTIONAL AMENDMENT.

"• Amends process for redistricting California's Senate, Assembly, Congressional and Board of Equalization districts.

"• Requires panel of three retired judges, selected by legislative leaders, to adopt new redistricting plan if measure passes and after each national census.

"• Panel must consider legislative, public comments/hold public hearings.

"• Redistricting plan effective when adopted by panel and filed with Secretary of State; governs next statewide primary/general elections even if voters reject plan.

"• If voters reject redistricting plan, process repeats, but officials elected under rejected plan serve full terms."

• Allows 45 days to seek judicial review of adopted redistricting plan."

the deadline for the Secretary of State to submit the ballot pamphlet materials to the printer was the following Monday, August 15, and the petition urged this court to grant review and permit the Secretary of State to take the actions necessary to ensure that the voters would have the opportunity to vote on Proposition 77 at the November 8, 2005, election. The Attorney General and CFFR on the following day, Thursday, August 11, 2005, filed separate answers to the emergency petition for review, and the proponents filed a reply on Friday, August 12, 2005.

On Friday afternoon, August 12, 2005, after considering the materials filed with the court, and taking into account the Secretary of State's Monday, August 15, 2005, 5:00 p.m. deadline for submitting the ballot pamphlet materials to the printer (the Secretary of State having informed the court that the deadline had to be met in order to permit ballot pamphlets to be printed and mailed to the voters within the statutorily prescribed periods), this court issued an order, signed by four justices, which (1) granted the petition for review, (2) stayed the judgment of the superior court that had directed the Secretary of State not to place any version of Proposition 77 on the November 8, 2005, special election ballot, (3) directed the Secretary of State and other public officials to proceed with all the steps required to place in the ballot pamphlet and on the ballot of the November 8, 2005, election the version of Proposition 77 included in the circulated petition signed by the requisite number of qualified voters (that is, the December 3 version), and (4) provided that "[a]ny public official or other person who has not had an opportunity to revise statements or ballot arguments that have already been submitted to the Secretary of State in order to reflect the version of Proposition 77 that will appear in the election pamphlet and on the ballot shall be permitted to submit a revised statement or ballot argument to the Secretary of State no later than 3 p.m. on Monday, August 15, 2005." The order further stated that, after the election, this court would determine whether to retain jurisdiction in this matter and resolve the issues raised in the petition.

After our order issued, and prior to the Secretary of State's submission of the ballot pamphlet material to the State Printer, the Attorney General submitted a title and summary of the December 3 version that included the identical fiscal analysis that had been included in the Attorney General's summary of the December 6 version, and the opponents of the measure added a passage both to their rebuttal to the argument in favor of Proposition 77 and to their argument against Proposition 77, stating that "two courts and three judges have already ruled that this measure shouldn't even be on the ballot." No change was made to the analysis by the Legislative Analyst. As ordered by this court, the December 3 version of the measure—the version included in the petition circulated for signature and signed by the requisite number of voters—was set forth in full in the ballot pamphlet.

At the November 8, 2005, election, Proposition 77 was voted upon and defeated. Although the defeat of Proposition 77 renders moot the legal challenge to the proposition, as noted at the outset of this opinion we have concluded that it is appropriate that this court retain this matter and issue an opinion to clarify (1) whether preelection review of this type of challenge to an initiative measure is appropriate, and (2) the legal standard that applies in determining whether the type of discrepancy involved in this case warrants withholding an initiative measure from the ballot.

## II

We turn first to the question whether the type of challenge to an initiative measure raised in this case—namely, a claim that an initiative measure should not be placed on the ballot because the version of the measure submitted to the Attorney General differs from the version circulated for signature—appropriately is subject to *preelection* judicial review or instead ordinarily should be considered by a court only *after* the measure has been submitted to the voters and the election has been held.

█ Past California decisions have observed that, as a general rule, "it is usually more appropriate to review constitutional and other challenges to ballot propositions or initiative measures after an election rather than to disrupt the electoral process by preventing the exercise of the people's franchise, in the absence of some clear showing of invalidity." (*Brosnahan v. Eu* (1982) 31 Cal.3d 1, 4 [181 Cal.Rptr. 100, 641 P.2d 200] (*Brosnahan I*).) More recently, however, in *Senate of the State of Cal. v. Jones* (1999) 21 Cal.4th 1142 [90 Cal.Rptr.2d 810, 988 P.2d 1089] (*Senate v. Jones*), we noted that decisions after *Brosnahan I* "have explained that this general rule applies primarily when a challenge rests upon the alleged unconstitutionality of the substance of the proposed initiative, and that the rule does not preclude preelection review when the challenge is based upon a claim, for example, that the proposed measure may not properly be submitted to the voters because the measure is not legislative in character or because it amounts to a constitutional revision rather than an amendment. [Citations.]" (21 Cal.4th at p. 1153.)[11] In the *Senate v. Jones* decision itself, we held that a constitutional challenge that rests upon a claim that a proposed initiative measure violates the single-subject rule may, in an appropriate case, be considered and resolved prior to the election, emphasizing that the constitutional provision establishing the single-subject limitation by its explicit terms contemplates

---

[11] See generally Gordon and Magleby, *Pre-Election Judicial Review of Initiatives and Referendums* (1989) 64 Notre Dame L.Rev. 298 (concluding that "it is generally improper for courts to adjudicate pre-election challenges to a measure's substantive validity" but that "pre-election review of challenges based on noncompliance with procedural requirements or subject matter limitations is proper").

the possibility and propriety of preelection review in providing that "[a]n initiative measure embracing more than one subject *may not be submitted to the electors* or have any effect." (Cal. Const., art. II, § 8, subd. (d), italics added.)

■ The legal challenge in the present case does not relate to the substantive validity of the initiative measure but rather involves a procedural claim pertaining to the preelection petition-circulation process. Past cases establish that, at least as a general matter, this type of procedural challenge— that is, a challenge based upon an allegation that a proposed initiative measure has failed to comply with the essential procedural requirements necessary to qualify an initiative measure for the ballot (for example, an initiative petition's alleged failure to have obtained the requisite number of qualified signatures)—may be brought and resolved prior to an election. (See, e.g., *Assembly v. Deukmejian* (1982) 30 Cal.3d 638, 646–654 [180 Cal.Rptr. 297, 639 P.2d 939] [preelection decision considering the effect of a variety of alleged defects in referendum petition, including claim that text of measure printed in petition varied from text of the enacted measure that was the subject of the referendum]; *Epperson v. Jordan* (1938) 12 Cal.2d 61 [82 P.2d 445] (*Epperson*) [preelection decision considering challenge to initiative measure contesting the completeness and accuracy of the Attorney General's summary of the measure set forth in the circulated petition]; *Clark v. Jordan* (1936) 7 Cal.2d 248 [60 P.2d 457] (*Clark*) [preelection decision sustaining challenge to proposed initiative measure on ground that "short title" set forth in circulated petitions violated statutory requirement that such title accurately describe the subject to which the petition relates, and finding it unnecessary to decide additional claim that petition was not supported by the required number of signatures]; *Boyd v. Jordan* (1934) 1 Cal.2d 468 [35 P.2d 533] (*Boyd*) [preelection decision sustaining challenge to proposed initiative based on misleading short title].) As these and similar cases implicitly recognize, because the question at issue in such a case is whether the initiative measure has satisfied the constitutional or statutory procedural prerequisites necessary to qualify it for the ballot, it is logical and appropriate for a court to consider such a claim prior to the election, because if the threshold procedural prerequisites have not been satisfied the measure is not entitled to be submitted to the voters. Unlike a challenge to the substantive validity of a proposed measure, it cannot properly be suggested that it would be premature to consider such a claim prior to the election, because the focus of the issue is solely upon whether the measure has qualified for the ballot, and not upon the validity or invalidity of the measure were it to be approved by the voters.

■ Furthermore, once a measure has been placed on the ballot and has been voted upon by the electorate, California decisions have been most reluctant to overturn the results of an election on the basis of a procedural defect that has occurred at the petition-circulation stage of the process, inasmuch as such a defect ordinarily will have no effect on the material that

is before the voters or on the fairness or accuracy of the election result. (See, e.g., *Lenahan v. City of Los Angeles* (1939) 14 Cal.2d 128, 132 [92 P.2d 1014] [challenges to form and sufficiency of recall petition held moot after recall election was held, emphasizing that none "of the alleged deficiencies or irregularities in the presentation and certification of the recall petition prevented a full and fair vote at the recall election"]; *Mapstead v. Anchundo* (1998) 63 Cal.App.4th 246, 272–277 [73 Cal.Rptr.2d 602] [challenge to sufficiency of signatures to qualify referendum became moot once election on referendum was held]; *Chase v. Brooks* (1986) 187 Cal.App.3d 657, 659–662 [232 Cal.Rptr. 65] [because "[t]he ballot measure and accompanying material adequately informed the electorate of the breadth and complete contents of the challenged ordinance," "[o]nce the election is held and the electorate has spoken, it becomes moot whether the referendum petitions failed to comply with [former] section 4052," which required that municipal referendum petitions contain entire text of the ordinance that is the subject of the referendum]; *Long v. Hultberg* (1972) 27 Cal.App.3d 606, 608–609 [103 Cal.Rptr. 19] [when election has been held and fairness of the election itself is not attacked, challenge to sufficiency of recall petitions is moot]; see also *Legislature v. Deukmejian* (1983) 34 Cal.3d 658, 666 [194 Cal.Rptr. 781, 669 P.2d 17] ["general rule favoring postelection review [of initiative or referendum measures] contemplates that no serious consequences will result if consideration of the validity of measure is delayed until after an election"]; *Assembly v. Deukmejian, supra*, 30 Cal.3d 638, 649 ["the postelection context is significantly different from a preballot-qualification setting. An election is a completed act, a fait accompli. In contrast, the circulation and qualification of referendum petitions are part of an ongoing process that portends, at most, the potential of an election"].) In light of this well-established remedial limitation regarding postelection challenges, it cannot be said that there is no harm in postponing until after the election a determination of the validity of this type of procedural challenge to the petition-circulation process, because after the election the procedural claim may well be considered moot. Accordingly, we conclude that the trial court and the Court of Appeal did not err in entertaining the procedural challenge in this case prior to the election.

■ Of course, the circumstance that a challenge involves the type of claim that properly may be considered by a court prior to the election does not establish that the claim in question is valid or that it justifies withholding the challenged measure from the ballot. Particularly when a preelection challenge is brought against an initiative measure that has been signed by the requisite number of voters to qualify it for the ballot, the important state interest in protecting the fundamental right of the people to propose statutory or constitutional changes through the initiative process requires that a court exercise considerable caution before intervening to remove or withhold the measure from an imminent election. Only when a court is confident that the

challenge is meritorious and justifies withholding the measure from the ballot, should a court take the dramatic step of ordering the removal of a measure that ostensibly has obtained a sufficient number of qualified signatures. (See, e.g., *Farley v. Healey* (1967) 67 Cal.2d 325, 327 [62 Cal.Rptr. 26, 431 P.2d 650] [court should order removal of an initiative measure from ballot only "on a compelling showing that a proper case has been established for interfering with the initiative power"]; *Zaremberg v. Superior Court* (2004) 115 Cal.App.4th 111, 116 [8 Cal.Rptr.3d 723] [" '[t]he ballot box is the sword of democracy. A court will intervene in the . . . process only when there are clear, compelling reasons to do so' "].)

In the present case, our grant of review did not rest upon a determination that the legal challenge in question should not have been brought or resolved prior to the election, but rather upon our disagreement with the merits of the lower courts' conclusion that the procedural defect in this case warranted withholding the initiative measure in question from the ballot. Because we concluded that the discrepancies in question did not justify withholding the proposition from the ballot, and because time constraints precluded an adequate opportunity for briefing, argument, deliberation, and the preparation and filing of an opinion prior to the election without unduly interfering with the printing and distribution of the ballot pamphlet and the administration of the election, we granted review, stayed the judgment rendered by the trial court, directed the Secretary of State to place the matter on the ballot, and authorized public officials and other persons to submit revised statements and ballot arguments relating to the version of the measure that had been circulated for signature and that was to be placed on the ballot. Our order permitted Proposition 77 to be placed on the ballot and preserved our ability to address the issues, after the election, through an opinion prepared with the benefit of full briefing and oral argument.

## III

In analyzing the legal question whether the disparities between the version of the initiative measure circulated for signature and the version submitted to the Attorney General warranted withholding the initiative measure from the ballot, we begin with the relevant constitutional and statutory provisions and then consider the judicial authorities that have addressed analogous claims in past cases.

## A

Article II, section 8 of the California Constitution provides (in subdivision (a)) that "[t]he initiative is the power of the electors to propose statutes and amendments to the Constitution and to adopt or reject them," and specifies (in

subdivision (b)) that a petition proposing such a measure must "set[] forth the text of the proposed statute or amendment to the Constitution" that is sought to be adopted.[12] Article II, section 10 of the state Constitution further provides (in subdivision (d)) that prior to the circulation of an initiative petition, "a copy shall be submitted to the Attorney General who shall prepare a title and summary of the measure as provided by law," and additionally (in subdivision (e)) explicitly authorizes the Legislature to provide "the manner in which petitions shall be circulated, presented, and certified, and measures submitted to the electors."[13]

The Legislature, in turn, has enacted numerous provisions in the Elections Code related to the initiative process. Section 9002, implementing the directive embodied in article II, section 10, subdivision (d) of the Constitution, provides that prior to circulation of an initiative petition, "a draft of the proposed measure" shall be submitted to the Attorney General with a written request for the preparation of a title and summary of the measure; that statute further provides that the title and summary prepared by the Attorney General "shall not exceed . . . 100 words."[14]

Section 9004 directs the Attorney General, upon receipt of a draft of a petition, to prepare "a summary of the chief purposes and points of the proposed measure." In establishing a deadline for the Attorney General's completion of the title and summary, section 9004 implicitly authorizes the proponents of the measure to submit to the Attorney General amendments to the proposed measure (either substantive or technical) within 15 days after the initial submission of the measure, and directs the Attorney General to provide

---

[12] Article II, section 8, subdivisions (a) and (b) provide in full: "(a) The initiative is the power of the electors to propose statutes and amendments to the Constitution and to adopt or reject them.

"(b) An initiative measure may be proposed by presenting to the Secretary of State a petition that sets forth the text of the proposed statute or amendment to the Constitution and is certified to have been signed by electors equal in number to 5 percent in the case of a statute, and 8 percent in the case of an amendment to the Constitution, of the votes for all candidates for Governor at the last gubernatorial election."

[13] Article II, section 10, subdivision (d) provides in full: "Prior to circulation of an initiative or referendum petition for signatures, a copy shall be submitted to the Attorney General who shall prepare a title and summary of the measure as provided by law."

Article II, section 10, subdivision (e) provides in full: "The Legislature shall provide the manner in which petitions shall be circulated, presented, and certified, and measures submitted to the electors."

[14] Section 9002 provides in full: "Prior to the circulation of any initiative or referendum petition for signatures, a draft of the proposed measure shall be submitted to the Attorney General with a written request that a title and summary of the chief purpose and points of the proposed measure be prepared. The title and summary shall not exceed a total of 100 words.

"The persons presenting the request shall be known as the 'proponents.'

"The Attorney General shall preserve the written request until after the next general election."

a copy of the title and summary to the Secretary of State either within 15 days after receipt of "the final version of a proposed initiative measure" or, if the Attorney General determines (pursuant to the provisions of section 9005) that the measure if adopted would affect the revenues or expenditures of the state or local government, within 15 days after the Attorney General's receipt of the fiscal estimate or opinion that is to be prepared by the Department of Finance and the Joint Legislative Budget Committee.[15]

■ Section 9007 further requires the Attorney General, "[i]mmediately upon the preparation of the summary of an initiative or referendum petition," to transmit copies "of the text of the measure and summary" to the Senate and the Assembly, and authorizes the appropriate committees to hold hearings on the subject of the measure. Section 9007 further makes clear that the provision is not intended to grant the Legislature authority "to alter the measure or prevent it from appearing on the ballot."[16]

---

[15] Section 9004 provides in full: "Upon receipt of a draft of a petition, the Attorney General shall prepare a summary of the chief purposes and points of the proposed measure. The summary shall be prepared in the manner provided for the preparation of ballot titles in Article 5 (commencing with section 9050), the provisions of which in regard to the preparation, filing, and settlement of titles and summaries are hereby made applicable to the summary. The Attorney General shall provide a copy of the title and summary to the Secretary of State within 15 days after receipt of the final version of a proposed initiative measure, or if a fiscal estimate or opinion is to be included, within 15 days after receipt of the fiscal estimate or opinion prepared by the Department of Finance and the Joint Legislative Budget Committee pursuant to Section 9005.

"If during the 15-day period, the proponents of the proposed initiative measure submit amendments, other than technical, nonsubstantive amendments, to the final version of the measure, the Attorney General shall provide a copy of the title and summary to the Secretary of State within 15 days after receipt of the amendments.

"The proponents of any initiative measure, at the time of submitting the draft of the measure to the Attorney General, shall pay a fee of two hundred dollars ($200), which shall be placed in a trust fund in the office of the Treasurer and refunded to the proponents if the measure qualifies for the ballot within two years from the date the summary is furnished to the proponents. If the measure does not qualify within that period, the fee shall be immediately paid into the General Fund of the state."

Section 9005 provides in relevant part: "Notwithstanding Section 9004, the Attorney General, in preparing a title or summary for an initiative measure, shall determine whether the substance thereof if adopted would affect the revenues or expenditures of the state or local government, and if he or she determines that it would, he or she shall include in the title either the estimate of the amount of any increase or decrease in revenues or costs to the state or local government, or an opinion as to whether or not a substantial net change in state or local finances would result if the proposed initiative is adopted.

"The estimates as required by this section shall be made jointly by the Department of Finance and the Joint Legislative Budget Committee, who shall deliver them to the Attorney General so that he or she may include them in the titles prepared by him or her."

[16] Section 9007 provides in full: "Immediately upon the preparation of the summary of an initiative or referendum petition, the Attorney General shall forthwith transmit copies of the text of the measure and summary to the Senate and Assembly. The appropriate committees of

■ Section 9008 provides that with regard to every proposed initiative measure, the title and summary prepared by the Attorney General must appear in 12-point or larger roman boldface type across the top of (1) each page of the petition on which signatures are to appear, and (2) upon each section of the petition immediately preceding the text of the measure.[17] (See also § 9001 [setting forth the general format for a proposed initiative measure].)[18] Section 9014 provides that an initiative petition may be presented in sections (rather than in a single, statewide petition), but also establishes that "each section shall contain a full and correct copy of the title and text of the proposed measure" and that the text of the measure must be printed in at least 8-point type.[19]

■ Finally, section 9012 provides that election officials who are authorized to receive or file an initiative petition shall not receive or file any petition "not in conformity with this article."

■ Considering these provisions as a whole, we conclude that there can be no question but that the relevant constitutional and statutory provisions

---

each house may hold public hearings on the subject of the measure. However, nothing in this section shall be construed as authority for the Legislature to alter the measure or prevent it from appearing on the ballot."

[17] Section 9008 provides in full: "Every proposed initiative measure, prior to circulation, shall have placed across the top of the petition in 12-point or larger roman boldface type, all of the following:

"(a) The summary prepared by the Attorney General upon each page of the petition on which signatures are to appear.

"(b) The summary prepared by the Attorney General upon each section of the petition preceding the text of the measure.

"(c) The summary prepared by the Attorney General as required by subdivision (b) shall be preceded by the following statement: 'Initiative measure to be submitted directly to the voters.'"

[18] Section 9001 provides in full: "The heading of a proposed initiative measure shall be in substantially the following form:

"Initiative Measure to Be Submitted Directly to the Voters

"The Attorney General of California has prepared the following title and summary of the chief purpose and points of the proposed measure:

"(Here set forth the title and summary prepared by the Attorney General. This title and summary must also be printed across the top of each page of the petition whereon signatures are to appear.)

"To the Honorable Secretary of State of California

"We, the undersigned, registered, qualified voters of California, residents of _____ County (or City and County), hereby propose amendments to the Constitution of California (the _____ Code, relating to _____) and petition the Secretary of State to submit the same to the voters of California for their adoption or rejection at the next succeeding general election or at any special statewide election held prior to that general election or otherwise provided by law. The proposed constitutional (or statutory) amendments (full title and text of the measure) read as follows:"

[19] Section 9014 is quoted at page 998, footnote 4, *ante*.

require that the version of a measure submitted to the Attorney General by the measure's proponents prior to circulation of the petition be the same version of the initiative measure circulated for signature. As noted, article II, section 10, subdivision (d) of the California Constitution provides that prior to circulation of an initiative petition for signature, "a copy" shall be submitted to the Attorney General, who shall prepare a title and summary. Additionally, section 9004 clearly contemplates that the title and summary prepared by the Attorney General will be based upon a review of "the final version of a proposed initiative measure."

Indeed, no party in the present proceeding has taken the position that the applicable constitutional and statutory provisions do not require the proponents of an initiative measure to submit to the Attorney General the final version of the measure that the proponents intend to circulate for signature. Furthermore, although the record establishes that the proponents in this case did submit to the Attorney General the final version of the measure they *intended* to circulate for signature, it is undisputed that, *inadvertently*, the version of the measure *actually* circulated by the proponents for signature differed in a number of respects from the version submitted to the Attorney General.

The question in dispute here is whether the inadvertent discrepancies between the two versions of the initiative measure in this case warranted withholding the measure from the ballot, notwithstanding the circumstance that the initiative petition was signed by the requisite number of eligible voters to qualify the measure for the ballot and that the version of the measure that the Secretary of State proposed to submit to the voters was the version circulated for signature. It is to this question that we now turn.

**B**

 Although it has been suggested that the issue before us turns on whether the controlling decisions require "strict" or "substantial" compliance with the applicable election laws, in some respects such an approach presents a potentially misleading dichotomy. As explained *post*, all of our past cases emphasize the utmost importance of ensuring the integrity of the electoral process and of interpreting and applying the applicable constitutional and statutory provisions in a manner that closely safeguards the integrity of that process. In instances in which a departure from a statutory requirement has been found to pose a realistic threat to the accuracy and integrity of the process—for example, by misleading the potential signers of an initiative petition regarding a significant feature of the proposed measure through the use of a confusing or incomplete title—courts have not been tolerant of such departures from procedural safeguards and have rejected claims that those

who signed the petition could have avoided confusion by relying upon the full text of the measure included in the petition.

At the same time, as we shall see, the governing cases also have recognized that an unreasonably literal or inflexible application of constitutional or statutory requirements that fails to take into account the purpose underlying the particular requirement at issue would be inconsistent with the fundamental nature of the people's constitutionally enshrined initiative power and with the well-established " 'judicial policy to apply a liberal construction to this power wherever it is challenged in order that the right be not improperly annulled. If doubts can reasonably be resolved in favor of the use of this reserve power, courts will preserve it.' " (*Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 591 [135 Cal.Rptr. 41, 557 P.2d 473]; see also *Epperson, supra,* 12 Cal.2d 61, 66 [emphasizing "the fundamental concept that provisions relating to the initiative should be liberally construed to permit, if possible, the exercise by the electors of this most important privilege"].) Thus, when California courts have encountered relatively minor defects that the courts find could not have affected the integrity of the electoral process *as a realistic and practical matter,* past decisions generally have concluded that it would be inappropriate to preclude the electorate from voting on a measure on the basis of such a discrepancy or defect. In such cases, as long as the fundamental purposes underlying the applicable constitutional or statutory requirements have been fulfilled, the decisions have concluded that there has been "substantial compliance" with the applicable constitutional or statutory provisions and that invalidation of a petition and preclusion of a vote on the measure is not warranted.

Two California Supreme Court decisions, decided within three months of one another in 1934, highlight the general judicial approach that long has been followed in this area. In *California Teachers Assn. v. Collins* (1934) 1 Cal.2d 202 [34 P.2d 134] (*California Teachers Assn.*)—decided in June 1934—a registrar of voters had refused to accept and file an initiative petition based upon the petition's ostensible failure to comply with the provisions of former Political Code section 1197b, which declared that "[a]cross the top of each page after the first page of every initiative . . . petition and section thereof . . . there shall be printed *in eighteen-point gothic type* a short title, *not to exceed twenty words,* showing the nature of the petition and the subject to which it relates." (Italics added.) The registrar in that case had relied upon the circumstance that the short title in the petition departed from the statutory requirements in two respects: (1) it was printed in 12-point boldface type instead of the 18-point gothic type called for by the statute, and (2) it contained 24 words, instead of the maximum of 20 words prescribed by the statute.

In analyzing the propriety of the registrar's rejection of the petition, the court in *California Teachers Assn.*, *supra*, 1 Cal.2d 202, began by explaining: "The requirements of both the Constitution and the statute are intended to and do give information to the electors who are asked to sign the initiative petitions. *If that be accomplished in any given case, little more can be asked than that a substantial compliance with the law and the Constitution be had, and that such compliance does no violence to a reasonable construction of the technical requirements of the law.*" (1 Cal.2d at p. 204, italics added.)[20]

In considering the short title's departure from the required type size and style, this court in *California Teachers Assn.*, *supra*, 1 Cal.2d 202, observed that other election-law provisions called for the use of 12-point boldface type and further noted that "[i]n actual size, there is a difference [between 12-point and 18-point type] of but six-seventy-seconds of an inch. Only one with very poor eyesight would be unable to read a line printed in twelve-point type as readily as one printed in eighteen-point type." (1 Cal.2d at p. 204.) Under these circumstances, the court in *California Teachers Assn.* concluded: "[W]e are of the view there has been a sufficiently substantial compliance with the statute." (*Ibid.*)

In considering the objection based upon the number of words in the short title, this court indicated that this objection "presents a more serious question, but one which we believe should be resolved in favor of petitioners in the present instance." (*California Teachers Assn.*, *supra*, 1 Cal.2d at pp. 204–205.) Reasoning that "the omission in the 'short title' of the words 'Constitutional Amendment' and the phrase 'Submitted Directly to the Electors' would detract nothing from its descriptive feature" (*id.* at p. 205), this court held that "[t]herefore, regarding the inclusion of these words and the phrase as surplusage, we are of the view that the mandate of the legislature has been substantially complied with, and that the purpose of the 'short title', which is

---

[20] As the italicized passage indicates, the *California Teachers Assn.* decision makes it quite clear that the "substantial compliance" doctrine applies to both constitutional and statutory provisions that set forth procedural requirements relating to the initiative or referendum process. As we discuss hereafter, during the more than 70 years since the opinion in *California Teachers Assn.*, California decisions uniformly have recognized that the substantial compliance doctrine applies both to constitutional and statutory provisions relating to elections. (See *post*, p. 1017.) Although the Court of Appeal in the present case expressed some uncertainty on this point, relying on an earlier decision of this court (*People v. City of San Buenaventura* (1931) 213 Cal. 637 [3 P.2d 3]) that stated that the substantial compliance rule does not apply to "mandatory constitutional requirements" (*id.* at p. 642), this aspect of the *City of San Buenaventura* decision clearly is inconsistent with *California Teachers Assn.* and subsequent decisions of this court. (See, e.g., *Perry v. Jordan* (1949) 34 Cal.2d 87, 94–95 [207 P.2d 47]; *Fox etc. Corp. v. City of Bakersfield* (1950) 36 Cal.2d 136, 145 [222 P.2d 879]; *Assembly v. Deukmejian*, *supra*, 30 Cal.3d 638, 652–653.) To avoid similar confusion in the future, we explicitly hold that *People v. City of San Buenaventura*, *supra*, 213 Cal. 637, has been overruled on this point.

to prevent the deceiving of electors by the use of misleading pages and titles after the first page, . . . has been served." (*Ibid.*) In addition, further demonstrating the practical nature of this court's approach and its consideration of the realistic consequences of its action with an eye to protecting the people's fundamental right of initiative, this court in *California Teachers Assn.* noted: "We are more strongly inclined to so hold in view of the fact that the present initiative petition was prepared and is being circulated in good faith, that many thousands of signatures thereto have already been secured, and the time is short within which the large number of required signatures can be again secured." (*Ibid.*)

In *Boyd, supra,* 1 Cal.2d 468—decided three months after *California Teachers Assn.,* in September 1934—this court again faced a claim that an initiative petition was invalid for failure to comply with former Political Code section 1197b, the same statute that had been at issue in *California Teachers Assn.* In *Boyd,* however, the claim was that the short title formulated by the proponents of the measure and set forth at the top of every page of the initiative petition after the first page—"Initiative Measure Providing for Adoption of Gross Receipts Act"—did not adequately describe "the nature of the petition and the subject to which it relates," as required by the statute in question.[21]

This court in *Boyd* initially noted that in *California Teachers Assn.,* the court had held that "substantial compliance with this provision of said section of the code was all that was required." (*Boyd, supra,* 1 Cal.2d at p. 471.) In determining whether the substantial compliance requirement was met in *Boyd,* this court, after considering the Attorney General's summary of the measure and its own examination of the petition, noted that "the proposed amendment to the Constitution provides for a tax to be levied upon gross receipts of money from all sources, with certain exceptions therein specified, sufficient in amount to meet and pay expenses of maintaining the state government and all political subdivisions of the state; all existing tax laws are repealed[;] an entirely new set of officers are provided for the levy and assessment of the proposed tax; and the offices of assessor and tax collector of every county in the state are abolished." (1 Cal.2d at pp. 471–472.) The court in *Boyd* then stated: "The short title used in this petition makes no reference to a tax or to the fact that the proposed amendment is a revenue measure. We think it is clear that the short title neither shows the nature of the petition, nor does it show the subject to which it relates. There is nothing in this short title which informed

---

[21] At the time of the *Boyd* decision, the relevant statutory provision permitted the proponents of an initiative measure to compose the short title to be included on each page of the petition after the first page. Shortly thereafter, the statute was amended to require the title and summary prepared by the Attorney General to be present on each page of the petition on which signatures are to appear. (See *Epperson, supra,* 12 Cal.2d 61, 65.) The current statutory provision retains the latter requirement. (§ 9008.)

the elector who was asked to sign it that the proposed measure provided for the levy of any tax whatever. He was informed that the petition provided for the adoption of a gross receipt act, but no information was given him as to the character of the proposed legislation regarding that subject. . . . In our opinion, this vital defect in the short title vitiates the whole petition and renders it inadequate for any purpose." (*Id.* at pp. 472–473.)

Because the short title at issue in *Boyd* did not adequately reveal the nature of the initiative measure or the subject to which the petition related, the court concluded it did not "amount to even a substantial compliance with the requirements of section 1197b of the Political Code, and for that reason we are constrained to hold that the proposed measure set out in the said petition is not entitled to be submitted to the electors of the state." (*Boyd, supra,* 1 Cal.2d at pp. 474–475; see also *Clark, supra,* 7 Cal.2d 248, 252 ["A title which tells the prospective signer that certain taxes are abolished, without telling him that a portion of the abolished taxes are imposed on real property, is definitely misleading. While we are of the opinion that statutes dealing with the initiative should be liberally construed to permit the exercise by the electors of this most important privilege, we are also of the opinion that statutes passed for the purpose of protecting electors from confusing or misleading situations should be enforced"].)

As the contrast between the results in the *California Teachers Assn.* and *Boyd* decisions illustrates, in determining whether a departure from statutory requirements imposed on initiative or referendum petitions by election-law provisions should be viewed as invalidating a circulated petition, past California decisions have been most concerned with departures that affect the integrity of the process by misleading (or withholding vital information from) those persons whose signatures are solicited.[22]

Nearly 50 years after the *California Teachers Assn.* and *Boyd* decisions, this court, in *Assembly v. Deukmejian, supra,* 30 Cal.3d 638, considered a preelection challenge to a referendum measure circulated against a reapportionment statute that had been enacted by the Legislature and signed by the Governor. After the referendum petition had been circulated and certified

---

[22] In addition to instances in which courts have found an initiative or referendum petition invalid because it contained a materially misleading or inadequate short title, the type of defect that most often has been found fatal is the failure of an initiative or referendum petition to comply with the statutory requirement of setting forth in sufficient detail the text of the proposed initiative measure or of the legislative act against which the referendum is brought "so that registered voters can intelligently evaluate whether to sign the initiative petition and to avoid confusion." (*Mervyn's v. Reyes* (1998) 69 Cal.App.4th 93, 99 [81 Cal.Rptr.2d 148]; see, e.g., *Myers v. Stringham* (1925) 195 Cal. 672, 675–676 [235 P. 448]; *Billig v. Voges* (1990) 223 Cal.App.3d 962, 967 [273 Cal.Rptr. 91]; *Creighton v. Reviczky* (1985) 171 Cal.App.3d 1225, 1232 [217 Cal.Rptr. 834].)

as having obtained a sufficient number of signatures to qualify for the ballot, a preelection judicial challenge was brought based on a variety of statutory defects in the referendum petitions. After analyzing the most serious of the defects at issue in that case and concluding, in light of the unusual circumstances present there, that the court would not withhold the referendum from the ballot on the basis of that defect even though it went "to the very heart" of the purpose of the particular statutory requirement at issue (30 Cal.3d at p. 648),[23] this court in *Assembly v. Deukmejian* turned its attention to a number of other challenges to what it described as "the technical sufficiency" of the referendum petitions.

We began by setting forth the standard that governs the determination whether such defects should invalidate a referendum or initiative measure, observing: "This court has stressed that technical deficiencies in referendum and initiative petitions will not invalidate the petitions if they are in 'substantial compliance' with statutory and constitutional requirements. (*California Teachers Assn.* v. *Collins*[, *supra*,] 1 Cal.2d 202, 204 [34 P.2d 134].) *A paramount concern in determining whether a petition is valid despite an alleged defect is whether the purpose of the technical requirement is frustrated by the defective form of the petition.* 'The requirements of both the Constitution and the statute are intended to and do give information to the electors who are asked to sign the . . . petitions. If that be accomplished in any given case, little more can be asked than that a substantial compliance with the law and the Constitution be had, and that such compliance does no violence to a reasonable construction of the technical requirement of the law.' (*Ibid.*)" (*Assembly v. Deukmejian, supra,* 30 Cal.3d at pp. 652–653, italics added.)[24]

---

[23] The most serious flaw in the referendum petition in *Assembly v. Deukmejian, supra,* 30 Cal.3d 638, arose from the circumstance that the sections of the circulated petition failed to ask each signing voter to provide his or her "residence address" as required by the applicable statute (former § 3516, now § 9020), but instead asked for "your address as registered to vote." This court in *Assembly v. Deukmejian* recognized that "[f]ar from being a mere technical shortcoming, real parties' failure to comply with the requirements of section 3516, subdivision (c), goes to the very heart of that section's purpose—to enable the clerk to ensure that petitions have been signed by those entitled to do so—and prevents that purpose from being effectuated." (30 Cal.3d at p. 648.) Nonetheless, the court in that case concluded that it would not withhold the referendum from the ballot on the basis of that defect, inasmuch as numerous past petitions had used the same format and never had been challenged, and also because a former version of the Secretary of State's handbook for petition circulators had provided misleading advice in this regard. Relying upon the judicial policy of "liberally construing" provisions relating to the initiative and referendum power, this court held that "[u]nder the unusual and unique circumstances of this case" the defect would not be deemed to render the referendum petition invalid, but warned that in the future a comparable "failure to . . . comply [with this statutory requirement] will render [a petition] invalid per se." (*Id.* at p. 652.)

[24] At another passage in its opinion, this court in *Assembly v. Deukmejian, supra,* 30 Cal.3d 638, repeated a different formulation of the substantial compliance standard that is at least potentially misleading. Quoting from an earlier decision rendered outside the context of

We then went on to discuss each of the alleged defects, concluding that none of the statutory deficiencies interfered with the purpose underlying the relevant statutory provision. One of the deficiencies in the referendum petition in *Assembly v. Deukmejian* was somewhat similar, although not identical, to the defect at issue in the present case. The applicable statute required a referendum petition to set forth "a full and correct copy of the title and text" of the legislative measure against which the referendum was brought. (Former § 3515, now § 9014.) The referendum petition at issue in *Assembly v. Deukmejian* included the purported text of the challenged reapportionment statute, but in setting forth the text of that legislative measure the petition contained errors in the listing of the redistricting census tract numbers, with the result that the text appended to the petition did not replicate the text of the reapportionment statute that was the subject of the referendum petition. Despite the variance, we rejected this challenge to the referendum petition rather summarily, stating simply that "[t]he errors were so minor as to pose no danger of misleading the signers of the petitions. They, therefore, do not affect the validity of the petitions." (30 Cal.3d at p. 653.)[25]

---

elections, we stated that " '[s]ubstantial compliance . . . means *actual* compliance in respect to the substance essential to every reasonable objective of the statute.' [Citation.]" (*Id.* at p. 649, original italics.) This formulation is unobjectionable so long as it is understood to mean that each objective or purpose of a statute must be achieved in order to satisfy the substantial compliance standard, but this language cannot properly be understood to require "actual compliance" with every specific statutory requirement. As we have seen, in *California Teachers Assn., supra,* 1 Cal.2d 202, this court found substantial compliance despite the circumstance that the short title on the petition in question was not set forth in the 18-point gothic type specifically required by the applicable statute.

[25] This court in *Assembly v. Deukmejian, supra,* 30 Cal.3d 638, also found that two additional flaws in the referendum petition did not warrant withholding the measure from the ballot. First, although the court found that the proponents' use of *preprinted dates* (utilizing a wide range of dates) on the declarations signed by petition circulators to show " '[t]he dates between which all signatures [on the petition section in question] were obtained,' " rather than the provision of specific dates filled in by individual petition circulators reflecting the dates within which the signatures on the particular petition section actually were obtained, impeded the ability of local election officials to determine whether those individuals who signed the petition section were registered voters at the time they signed the petition section, and although the court stated that petition circulators in the future personally should enter the actual dates between which all signatures on the petition section were signed, the court concluded that—because "no showing has been made that the more general information provided prevented the clerks from carrying out [their] function"—this flaw did not warrant invalidating the referendum petition. (30 Cal.3d at p. 653.) Second, the court rejected the claim that the use of small type and interleaved pages in the circulated petition made the text of the reapportionment statute "virtually unreadable" (*id.* at p. 652), concluding: "[T]he petitions were fully readable, despite the small size of the type. The color-coded referenda packets were sufficiently labeled and differentiated to meet the requirements of the substantial compliance test. Neither of these defects frustrated the signer's ability to understand what he or she was being asked to sign. Accordingly, neither of them renders the petitions invalid." (*Id.* at pp. 653–654.)

 Over the years, numerous relatively minor departures from the constitutional and statutory requirements applicable to initiative and referendum measures have been found to satisfy the substantial compliance test, so long as the court was able to conclude that the departure in question, as a realistic and practical matter, did not undermine or frustrate the basic purposes served by the statutory requirements in ensuring the integrity of the initiative or referendum process.[26]

Recently, in *MHC Financing Limited Partnership Two v. City of Santee* (2005) 125 Cal.App.4th 1372 [23 Cal.Rptr.3d 622] (*MHC Financing*), the Court of Appeal had occasion to apply the substantial compliance doctrine in a factual setting quite comparable to the present case, in which a title and summary that was prepared on the basis of one version of a proposed initiative measure inadvertently was used on a circulated initiative petition that set forth a different version of the initiative measure. Because of the similarity of the issue addressed in that case to the issue presented here, we discuss the *MHC Financing* decision in some detail.

The initiative measure in *MHC Financing* proposed adoption of a local mobilehome rent control ordinance. The proponents of the proposed initiative

---

[26] See, for example, *Zaremberg v. Superior Court, supra,* 115 Cal.App.4th 111, 119–120 (holding referendum petition substantially complied with Elections Code provisions despite proponents' failure to print short title on each page of the petition as required by section 9011, where pages from which short title was missing were continuation pages of the text of the statute in question and short title appeared both on the first page of the petition and on the signature page); *Alliance for a Better Downtown Millbrae v. Wade* (2003) 108 Cal.App.4th 123, 131, footnote 2 [133 Cal.Rptr.2d 249] (noting that even if the initiative petition did not fully comply with section 9203 when the title and summary of the measure were reprinted on the front, but not the back, of each signature sheet, there was substantial compliance with the statute "because the summary statement on one side of the sheet of paper informs the signer of the content of the proposed initiative, thereby providing ' "the substance essential to every reasonable objective of the statute" ' "); *People v. Scott* (2002) 98 Cal.App.4th 514, 520 [119 Cal.Rptr.2d 797] (finding substantial compliance with applicable Elections Code provisions despite differences between the version of initiative measure circulated for signature and the version of measure that appeared in ballot pamphlet and was approved by voters, where there was no showing "that any of the differences in the text of the initiative were material deficiencies or that such purported defects 'affected the ability of the voters to make an informed choice' "); *Hayward Area Planning Assn. v. Superior Court* (1990) 218 Cal.App.3d 53, 59 [266 Cal.Rptr. 745] (finding substantial compliance despite referendum petition's failure to include across the top of each page the generic language "Referendum Against an Ordinance Passed by the City Council" required by former section 4052 (now § 9238), where petition contained a statement that the court found was as "informative and helpful as the words" specified in the statute). (But cf. *Ibarra v. City of Carson* (1989) 214 Cal.App.3d 90, 99–100 [262 Cal.Rptr. 485] [rejecting claim of substantial compliance where proponents of local initiative measure published, but did not post, a notice of intent to circulate the petition three days prior to circulating the petition, even though there was no indication that the purpose underlying the applicable statute (former § 4003, now § 9205) was not adequately achieved by the timely publication of the notice of intent to circulate and by the inclusion in the petition of an accurate title and summary prepared by the city attorney].)

initially submitted a version of the measure to the city attorney on March 18, 1998 (the March 18 version), requesting the preparation of a ballot title and summary; in response, the city attorney prepared a ballot title and summary and provided them to the proponents and to the city clerk. On April 2, 1998, the proponents submitted to the city attorney a modified version of the initial measure (the April 2 version) but failed to expressly request a ballot title and summary, and the city attorney did not prepare a title and summary for the April 2 version. Thereafter, the proponents included the April 2 version of the measure on the petition that was circulated for signature, using the ballot title and summary that had been prepared by the city attorney on the basis of the March 18 version. The circulated petition obtained the requisite number of signatures and the city council, which was required under the governing law either to submit the proposed ordinance to the voters or to adopt the proposed ordinance, opted to adopt the ordinance. In doing so, however, the city council inadvertently adopted the March 18 version. After a lawsuit was filed challenging the constitutionality of the ordinance, the city council's mistake was discovered, and the city council, to correct its mistake, enacted a new ordinance containing the text of the April 2 version.

In *MHC Financing*, the trial court held the ordinance adopted by the city invalid on a variety of grounds, including violation of the Elections Code provisions relating to the required ballot title and summary for local initiative petitions,[27] but the Court of Appeal reversed, concluding on this point that the trial court had erred in determining that the adopted ordinance was invalid "on the ground that a ballot title and summary was not prepared for the April 2 initiative." (*MHC Financing, supra*, 125 Cal.App.4th 1372, 1388.)

In reaching its conclusion, Justice Aaron's opinion for the court in *MHC Financing* began its analysis by explaining: "When, as here, there is no dispute about the format of an initiative petition presented to the city clerk, and the issue on appeal is whether the petition substantially complies with the ballot title and summary requirements of section 9203, subdivision (b), we review the matter de novo." (*MHC Financing, supra*, 125 Cal.App.4th at pp. 1388–1389, fn. omitted.) After citing the relevant passage from our decision in *Assembly v. Deukmejian, supra*, 30 Cal.3d 638, regarding the crucial importance of considering *the purpose* of the relevant statutory requirement in determining whether there has been substantial compliance, the court in *MHC Financing* continued: "The purposes served by the ballot title

[27] The Elections Code provisions applicable to municipal initiative measures (§ 9200 et seq.) largely parallel the statutes that are applicable to statewide initiatives. Section 9203 provides for submission of "a copy of the proposed measure" to the local election official with a request for a ballot title and summary, and directs the election official to transmit the material to the city attorney for preparation of a title and summary. After the title and summary are prepared, they are provided to the proponent of the measure, and the proponent is required to print the title and summary across the top of each page of the petition on which signatures are to appear.

and summary requirements of section 9003, subdivision (b), are: (1) to reduce the risk that voters were misled when signing the petition; (2) to allow verification that the signers had a neutral explanation of the proposed ordinance available to them when they signed; and (3) to prevent signatures from being submitted in support of a different measure than that for which they were procured." (*MHC Financing, supra*, 125 Cal.App.4th at p. 1389.)

The court in *MHC Financing, supra*, 125 Cal.App.4th 1372, then explained: "Based on our own comparison of the ballot title and summary circulated with the April 2 initiative petition with the sections of the April 2 initiative addressed by the summary, we are satisfied that the title and summary adequately reflect the substance of the April 2 initiative and therefore did not frustrate the purposes of the title and summary requirement of section 9203." (*Id.* at p. 1389.) Although the court in *MHC Financing* acknowledged that the differences between the text of the March 18 version and the text of the April 2 version were substantive in nature and that the April 2 version represented an " 'alteration' " of the March 18 version (*ibid.*), the court at the same time observed that the differences "do not go to the heart of the circulated initiative, and thus do not render the ballot title and summary prepared for the uncirculated March 18 initiative misleading as to the circulated April 2 initiative." (*Id.* at pp. 1389–1390.) Although in *MHC Financing* some of the differences in the two versions involved provisions of the initiative measure that actually were mentioned in the city attorney's summary that appeared on the petition, the Court of Appeal, after examining the language of the summary, found that the minor differences "did not create a risk that voters signing the initiative petition were misled." (*Id.* at p. 1390.)

The court in *MHC Financing* concluded: "[W]hile the initiative petition *technically* did not comply with section 9203 because the City Attorney did not prepare a ballot title and summary specifically for the April 2 initiative, the petition *substantially* complied with section 9203 because the ballot title and summary that circulated with it accurately reflected the substance of the accompanying April 2 initiative and did not create a risk that voters signing the petition would be misled about the substance of the initiative. The ballot summary's technical noncompliance with section 9203 did not infringe the electors' constitutional right of initiative." (*MHC Financing, supra*, 125 Cal.App.4th at p. 1391, original italics.)

The majority opinion in the Court of Appeal in the present case acknowledged the decision in *MHC Financing, supra*, 125 Cal.App.4th 1372, but held that the earlier decision was distinguishable from the present case because in that matter (1) the city council had chosen to adopt the ordinance rather than to submit the measure to the voters and the city council retained the authority to adopt such a measure notwithstanding any potential defects in the initiative

circulation process, and (2) the proponents in *MHC Financing* had submitted the April 2 version to the city attorney (but had not requested or obtained a title and summary for that version). The Court of Appeal decision in *MHC Financing*, however, did not rely upon those circumstances or justifications in analyzing the asserted violation of the election statute, but instead clearly held that there was substantial compliance with the applicable Elections Code provisions because the ballot title and summary that actually circulated with the initiative petition accurately reflected the substance of the version of the initiative measure that was included in the petition. Unlike the Court of Appeal majority in the present case, we find the reasoning and conclusion in *MHC Financing* directly on point.[28]

As described at the outset of this opinion (see p. 997, *ante*), the December 6 version of the initiative measure submitted to the Attorney General differed in a number of respects from the December 3 version that circulated for signature, including most significantly (1) a substantial revision of the wording of the "Findings and Declarations of Purpose," (2) a one-day reduction in the time in which legislative leaders were to make their nominations and exercise peremptory challenges in creating the final list of judges from which the special masters were to be chosen by lot, and (3) an explicit statement that, with regard to the redistricting process, the initiative and referendum power was to be used only in the manner specified in the initiative measure.[29] Evaluating the significance of the differences in the two versions in light of the legal standard established and applied in the numerous prior California decisions reviewed *ante*, we conclude that although the variance in the two versions constituted a constitutional and statutory defect, the inadvertent differences at issue here did not mislead the public or otherwise defeat or undermine the fundamental purposes underlying the relevant constitutional and statutory provisions and thus there was substantial compliance with those provisions. Accordingly, we conclude that the discrepancies did not require or justify withholding the initiative measure from the ballot.

---

[28] Justice Kennard's concurring and dissenting opinion suggests that our reliance upon the decision in *MHC Financing* is misplaced because that case addressed the issue in question in the context of what the concurring and dissenting opinion characterizes as a postelection, rather than preelection, challenge. (See conc. & dis. opn. by Kennard, J., *ante*, pp. 1037–1038.) As demonstrated by the passages from *MHC Financing* set forth *ante*, however, the Court of Appeal decision in *MHC Financing* did not rely upon that circumstance in analyzing or resolving the relevant claim, but rather relied upon reasoning that is directly applicable to the resolution of the issue before us. Thus, the concurring and dissenting opinion's ground for distinguishing *MHC Financing* is no more convincing than the distinctions relied upon by the Court of Appeal.

[29] As noted *ante*, the differences in the two versions are set forth in full in an appendix to this opinion.

■ In urging this court to uphold the Court of Appeal's contrary conclusion in this case, both the Attorney General and CFFR, while conceding that typographical or clerical differences between the version of an initiative measure submitted to the Attorney General and the version circulated for signature would not justify withholding the circulated version from the ballot, emphasize that the differences between the two versions in this case cannot properly be characterized as simply clerical or stylistic but included substantive differences as well. We agree that the discrepancies between the two versions of Proposition 77 included some substantive differences, but as the decision in *MHC Financing* demonstrates, it does not follow that the existence of *any* substantive difference or *any* difference in meaning between such versions *necessarily* results in the frustration of the purposes underlying the applicable statutory requirements.

The constitutional and statutory provisions pertaining to the Attorney General's preparation of a ballot title and summary illustrate this point. (Cal. Const., art. II, § 10, subd. (d); Elec. Code, §§ 9002, 9004.) Past decisions establish that the principal purpose underlying the requirement that the proponents of an initiative measure submit a copy of it to the Attorney General prior to circulation is to enable that official to prepare an accurate and objective title and summary that must be prominently included in the circulated petition and that will provide the voters whose signatures are sought with an accurate and objective description of the general subject matter of the initiative and its main points. (See, e.g., *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 243 [149 Cal.Rptr. 239, 583 P.2d 1281]; *Epperson, supra*, 12 Cal.2d 61, 66–71.)

In the present case, the proponents submitted the December 6 version of the proposed initiative to the Attorney General for preparation of a title and summary, the Attorney General prepared a title and summary on the basis of that version, and that ballot title and summary was included in the circulated petition along (inadvertently) with the text of the December 3 version. Thus, the registered voters who signed the petition had before them the full text of the December 3 version—the version that the Secretary of State proposed to place on the November 8, 2005, election ballot—as well as the title and summary that was prepared by the Attorney General on the basis of the December 6 version.

As noted, when this matter was before the Court of Appeal, that court directed the Attorney General to prepare a title and summary using the December 3 version of the measure that was circulated with the petition, and the Attorney General, after review, prepared a title and summary for the December 3 version that the Attorney General acknowledged did not differ in any material respect from the title and summary that had been prepared for

the December 6 version. Under these circumstances, it is clear that the discrepancies in the two versions of the measures—albeit involving some substantive details rather than merely clerical errors—did not adversely affect the accuracy or completeness of the Attorney General's ballot title and summary with regard to the version of the measure that was circulated with the petition and thus did not mislead the public or otherwise frustrate the purpose underlying the constitutional and statutory provisions relating to the Attorney General's preparation of a ballot title and summary.

In reaching its conclusion, the Court of Appeal majority did not suggest that the discrepancies in the two versions of the measure frustrated the purposes served by the statutory provisions calling for the Attorney General's preparation of a ballot title and summary. Instead, the Court of Appeal observed that the constitutional and statutory requirement that the version of an initiative measure that is circulated for signature be the same version as that submitted to the Attorney General serves *additional* purposes beyond the preparation of an accurate and objective title and summary to be included in the initiative petition. As the Court of Appeal noted, the applicable Elections Code provisions require the Attorney General not only to prepare a title and summary but also to provide a copy of the version of the measure that has been submitted by the proponents to (1) the Secretary of State (§ 9004), (2) the Department of Finance and the Joint Legislative Budget Committee (§ 9005), and (3) the Legislature (§ 9007), each of whom presumably will rely upon the version of the measure forwarded by the Attorney General in performing its own required or authorized functions. The Court of Appeal concluded that the existence of different versions of the measure frustrated the purposes underlying these additional statutory provisions which, in the Court of Appeal's terminology, are intended to ensure that all the relevant officials are "on the same page."[30]

---

[30] The Court of Appeal majority additionally stated that the version of the measure submitted to the Attorney General "fix[es] the text of the proposed initiative" for a number of other purposes, namely "proofreading [of the measure] by the Legislative Counsel (§ 9091), . . . the preparation of arguments for and against the measure if qualified (§§ 9041, 9042, 9044, 9064), and the preparation of an analysis of the measure by the Legislative Analyst for the ballot pamphlet (§§ 9091, 9086, 9087)." Although nothing in the applicable statutes explicitly provides that the version of an initiative measure submitted to the Attorney General is intended to "fix the text" of the measure for these additional purposes—in this case, for example, the Secretary of State sent the December 3 version of the measure to the Legislative Counsel for proofreading (see p. 1002, fn. 9, *ante*)—we acknowledge that in many instances these officials and other individuals may rely upon the text of the measure submitted to the Attorney General in performing their functions or in drafting ballot arguments. Nonetheless, as is the case with regard to the public officials to whom the Attorney General is required by statute to provide a copy of the submitted version, the existence of differences between the text of an initiative measure submitted to the Attorney General and the text of the measure circulated for signature

■ Although we agree that the applicable statutory provisions serve the additional purposes noted by the Court of Appeal, we do not agree that the existence of different versions of an initiative measure *necessarily* or *invariably* frustrates the purposes of these provisions. Just as the purpose served by the Attorney General's obligation to prepare an accurate and objective title and summary is not defeated by the existence of different versions when the differences in the versions would not have materially affected the content of the title and summary, so are the purposes underlying the additional statutory provisions relied upon by the Court of Appeal not frustrated when the content of the statements or analyses that are to be prepared by various public officials and other individuals would not be materially affected by the different versions of the measure, or when the differences are discovered in sufficient time to permit those officials and other affected individuals to prepare accurate reports or analyses (or to hold legislative hearings) directed to the version of the initiative measure that is to be submitted to the voters.

In this case, because the differences in the two versions were brought to the attention of the relevant public officials (and to the opponents of the measure) before the ballot pamphlet and ballot materials were sent to the printer, and because, in light of the relatively minor differences in the two versions, there was adequate time for the public officials and opponents to make any revisions deemed necessary to reflect the version that was to be voted upon in the election, we conclude that the discrepancies did not frustrate or undermine the purposes served by these provisions so as to make it appropriate for a court to withhold the measure from the ballot. Accordingly, just as the submission of the December 6 version of the measure to the Attorney General constituted substantial compliance with the ballot title and summary provisions because it did not frustrate the purpose of the statutorily specified title and summary procedure, we conclude there was substantial compliance with respect to these additional statutory provisions as well.[31]

Aside from the applicable statutory requirements and purposes, the Court of Appeal suggested that the discrepancies between the version of the measure submitted to the Attorney General and the version circulated for signature warranted withholding the measure from the ballot because the

---

does not *necessarily* or *invariably* frustrate or undermine the work product of such individuals, and, for the reasons discussed hereafter, we conclude that in the present case the differences did not have a prejudicial effect.

[31] We note that submission of an initiative measure to the Attorney General and the Attorney General's provision of a title and summary serve a number of additional purposes under other Elections Code provisions, including identifying the individuals who are to be considered the "proponents" of the measure for various statutory purposes (see §§ 342, 9002, 9032, 9067) and establishing the beginning date of the period in which signatures must be collected (§ 336). With respect to these statutory purposes as well, the differences in the two versions of the initiative measure here at issue had no adverse effect.

Attorney General, although not statutorily required to do so, posted the version that had been submitted to him on the Attorney General's Web site, and some voters who signed the initiative petition may have done so on the assumption that the version of the measure included in the initiative petition was the same version as that posted on the Attorney General's Web site. Although as a theoretical matter it is possible that some persons who signed the petition previously had read the text of the measure that was posted on the Attorney General's Web site, there is no evidence in the record to suggest as a realistic matter either that a significant number of signers directly or indirectly obtained information about the initiative measure from the version of the measure posted on the Attorney General's Web site, or, in any event, that the minor differences in the two versions would have affected the decision of *any* person to sign or not to sign the initiative petition or to take any other action related to the petition.[32] As is demonstrated by the past California decisions reviewed *ante*, in this context courts have taken a realistic and practical view of the consequence of relatively minor statutory lapses, refusing, for example, to withhold a measure from the ballot because of the theoretical possibility that a smaller type size in a title might have affected potential signers when the actual type size utilized was not unduly small and was clearly readable (*California Teachers Assn., supra,* 1 Cal.2d 202, 204), or to invalidate a referendum petition because of the theoretical possibility that minor errors in the text of the measure attached to the petition might have been read and relied upon by some of the persons who signed the petition. (*Assembly v. Deukmejian, supra,* 30 Cal.3d 638, 653.)

At oral argument, the Attorney General strenuously urged the court to adopt a "bright-line" rule under which *any* difference in meaning between the version of an initiative measure submitted to the Attorney General and the version circulated for signature would invalidate the circulated petition, without regard to the significance or insignificance of the particular discrepancy in meaning or to whether there is any realistic possibility that the

---

[32] In response to the argument that some persons who signed the initiative petition may have been misled by the text of the initiative petition posted on the Attorney General's Web site, the proponents of the measure asserted that because there were fewer than 8,000 visits to the Attorney General's Web site to view the measure and because the number of qualified signatures on the petition exceeded the required number by many more than 8,000, the version posted on the Web site could not have affected the validity of the certification. We agree with the Court of Appeal that the number of visits to the Attorney General's Web site cannot properly be viewed as determinative, because persons or entities who read the Web site version may have formulated their views and spoken publicly about the measure on the basis of that version, potentially affecting many more persons. Again, however, the conclusion that the Court of Appeal drew from this circumstance rests solely on the theoretical possibility of widespread confusion. In this case, there is absolutely no evidence that the Web site version led to widespread publicity or confusion, or that the minor differences between the two versions realistically affected the view of *any* person who visited the Web site or *any* potential signer.

difference or differences in question actually affected the actions of any person or the integrity of the electoral process. The Attorney General argued that because the constitutional and statutory provisions requiring the proponents of an initiative measure to include in the circulated petition the same version of the initiative measure as that submitted to the Attorney General are not difficult to understand or comply with, *any* departure in meaning should not be tolerated. The Attorney General acknowledged that his proposed standard (requiring the invalidation of a petition if there is any difference in meaning in any aspect of the measure) would compel a court to withhold from an imminent election a universally popular and urgently needed "good government" constitutional initiative measure that had been signed by millions of voters, even if the only difference between the version submitted to the Attorney General and the version circulated for signature was an inadvertent mistake in the printing of an insignificant numeral (which by definition would always result in a change in meaning) that could not possibly have affected the decision of any signer, voter, or any other person. The Attorney General argued that this concededly "harsh" result is required to effectuate the applicable constitutional and statutory electoral provisions. The concurring and dissenting opinion of Justice Kennard embraces the Attorney General's argument.

 As we have seen, however, the past decisions of this court involving similar challenges to initiative or referendum petitions—reaching back more than 70 years—uniformly refute the position advanced by the Attorney General and endorsed by Justice Kennard's concurring and dissenting opinion. Rather than adopting a "bright-line" rule mandating the invalidation of an initiative petition for violating an applicable election-related statute when the title on the top of each page of a petition was set forth in 12-point boldface type rather than 18-point gothic type or contained 24 rather than 20 words (see *California Teachers Assn., supra*, 1 Cal.2d 202, 204–205), or the setting aside of a referendum petition when the text of the statute set forth in the petition did not precisely track the actual legislation at issue (see *Assembly v. Deukmejian, supra*, 30 Cal.3d 638, 653), the governing California decisions consistently have applied a "substantial compliance" rule in this context, realistically evaluating whether the particular defect in question frustrates the purposes of the applicable election requirement. Although each of the constitutional and statutory requirements at issue in these and similar past California cases was clear on its face and ostensibly not difficult to comply with, all of the decisions in this area implicitly recognize that inadvertent, good-faith human error cannot always be avoided and that it would be inconsistent with the fundamental constitutional interests of the tens or hundreds of thousands of persons who have signed an initiative or referendum petition to invalidate an otherwise qualified petition (and prohibit the matter from being presented to all of the voters for their approval or

disapproval) when it is apparent that the technical defect in question, as a realistic matter, did not adversely affect the integrity of the electoral process or frustrate the purposes underlying the relevant constitutional or statutory requirements. Under such circumstances, the controlling decisions establish that precluding an otherwise qualified initiative or referendum measure from being placed on the ballot is not an appropriate remedy.

Furthermore, past cases also demonstrate that there is no merit to the claim that the any-change-in-meaning rule proposed by the Attorney General must be adopted in this context because courts are incapable of determining (or cannot be trusted to determine) objectively whether the differences between the version of a measure submitted to the Attorney General and the version circulated for signature pose a realistic danger of misleading the signers of a petition or for any other reason threaten the integrity of the electoral process. In many prior California decisions, courts have compared the titles and summaries of initiative petitions with the substantive provisions of the initiative measures themselves to determine whether the titles and summaries are accurate or potentially misleading (see, e.g., *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization, supra,* 22 Cal.3d 208, 243; *Epperson, supra,* 12 Cal.2d 61, 65–71; *Clark, supra,* 7 Cal.2d 248, 249–252; *Boyd, supra,* 1 Cal.2d 468, 470–475; *MHC Financing, supra,* 125 Cal.App.4th 1372, 1390–1391; *Zaremberg v. Superior Court, supra,* 115 Cal.App.4th 111, 116–118), and also have considered whether differences or omissions in the text of measures appended to a petition or included in a ballot pamphlet do or do not pose a realistic danger of misleading those who signed the petition or voted for the measure. (See, e.g., *Assembly v. Deukmejian, supra,* 30 Cal.3d 638, 653; *People v. Scott, supra,* 98 Cal.App.4th 514, 519–520; *Billig v. Voges, supra,* 223 Cal.App.3d 962, 966–968; *Chase v. Brooks, supra,* 187 Cal.App.3d 657, 664.) In light of these numerous authorities, there is no reasonable basis for maintaining that courts cannot or should not continue to evaluate the type of statutory defect at issue here pursuant to the legal standard that has been applied consistently in past California initiative and referendum cases for so many years.

 In sum, because we conclude that the discrepancies between the version of the initiative measure submitted to the Attorney General and the version circulated for signature did not mislead the public or otherwise frustrate or undermine the purposes underlying any of the applicable constitutional or statutory provisions or threaten the integrity of the electoral process, we find there was substantial compliance with these requirements. For this reason, we conclude that Proposition 77 properly was submitted to the voters.

In reaching this conclusion, we emphasize that a crucial factor in our decision is that the proponents of the measure, in demonstrating how the

discrepancy in this case occurred, clearly established that the discrepancy was *inadvertent*, and that *no* evidence was presented suggesting that the proponents *intentionally* circulated a version of the measure different from the version submitted to the Attorney General for preparation of a title and summary prior to circulation. Very different considerations would come into play if a proponent of an initiative measure attempted to manipulate the initiative process by intentionally circulating a version different from the version submitted to the Attorney General. In such a case, protection of the integrity of the electoral process might very well call for withholding the measure from the ballot even if a court viewed the differences as relatively minor, both because the proponents' intent to circumvent the Attorney General's review would suggest that the proponents viewed the differences as significant, and because such a sanction might well be necessary in order to deter such intentional misconduct. In the present case, the evidence indicates—and the trial court expressly found—that the proponents' circulation of a different version was *inadvertent*.[33]

Finally, to avoid any misunderstanding, we emphasize that our holding in this case *does not mean* that the proponents of an initiative measure properly may circulate, even inadvertently, a version of the measure that differs from the version submitted to the Attorney General. As discussed above (see p. 1012, *ante*), the applicable constitutional and statutory provisions require the proponents of an initiative measure to submit to the Attorney General prior to circulation of the petition a copy of the final version of the initiative measure that they intend to circulate, and require the proponents to circulate for signature that same version with their petition. Although, for the reasons discussed *ante*, we have concluded that the differences in the two versions in the present case did not frustrate the purposes underlying the applicable constitutional and statutory provisions and

---

[33] The opponents of Proposition 77 suggest that the proponents should be viewed as having acted to manipulate the process in this case because they failed to disclose the discrepancies in the two versions until after the Secretary of State certified the measure for the ballot. Although we believe that the proponents should have disclosed the discrepancy immediately upon discovering it (see generally *Stevens v. Superior Court* (1986) 180 Cal.App.3d 605, 608–609 [225 Cal.Rptr. 624] [discussing failure to disclose a material fact]), we do not believe the proponents' failure in this regard properly can be equated with intentionally circulating for signature a version that the proponents know is different from the version submitted to the Attorney General. Here, there clearly was no intent to subvert or circumvent the provisions requiring submission of a copy of the initiative measure to the Attorney General.

Further, although the proponents should have disclosed the discrepancy more promptly, there is no reason to conclude that the delay affected the resolution of this matter. Even if the proponents' disclosure had preceded the Secretary of State's certification of the measure for the ballot and even if the Secretary of State had declined to certify the matter absent a judicial determination of the substantial compliance issue, in light of our de novo conclusion (see *MHC Financing, supra*, 125 Cal.App.4th 1372, 1389) that there was substantial compliance with the applicable statutes, the measure would have been placed on the ballot in any event.

thus did not justify withholding the proposition from the ballot, a similar conclusion may not be warranted in other circumstances. As past cases establish, when the proponents of an initiative measure properly submit to the Attorney General the same version of the measure that is circulated for signature, the title and summary prepared by the Attorney General are presumed accurate and sufficient (see, e.g., *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization, supra,* 22 Cal.3d 208, 243; *Vandeleur v. Jordan* (1938) 12 Cal.2d 71, 73 [82 P.2d 455]; *Epperson, supra,* 12 Cal.2d 61, 66), but no similar presumption applies when the version submitted to the Attorney General differs from the version circulated for signature. Accordingly, proponents of initiative petitions would be well advised to take all steps necessary to ensure that the mishap that occurred in the present case does not recur in the future.

## IV

For the reasons discussed above, the judgment of the Court of Appeal, upholding the trial court's decision withholding Proposition 77 from the November 8, 2005, election ballot, is reversed. Because Proposition 77 was defeated at the November 8, 2005, election, the underlying challenge to the submission of Proposition 77 to the voters, and the petition in this writ proceeding opposing that challenge, are moot.

Although the conclusion we reach—that the error committed by the proponents of Proposition 77 did not justify the action of the lower courts in withholding Proposition 77 from the election ballot—renders the proponents the prevailing party, because the proponents' negligence in the petition-circulation process created the problem that led to this controversy and to the need for its judicial resolution, we direct that each party bear its own costs in this and the underlying proceedings. (Cal. Rules of Court, rule 29.7.)

The judgment of the Court of Appeal is reversed, and the matter is remanded to that court with directions to dismiss this proceeding as moot.

Baxter, J., Chin, J., and Aldrich, J.,* concurred.

**KENNARD, J.,** Concurring and Dissenting.—I concur in the majority's holdings that: (1) Preelection judicial review of a challenge to an initiative measure is appropriate when the challenge is based on a claim that the measure does not comply with procedural requirements necessary to qualify

---

*Associate Justice of the Court of Appeal, Second Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

the matter for the ballot; (2) our state Constitution and statutes require that the version of a proposed initiative submitted by its proponents to the state Attorney General be the same as the version circulated to the public for signatures sufficient to qualify the initiative for placement on the ballot; and (3) the doctrine of substantial compliance applies to procedural challenges to initiative measures.

I dissent, however, from the majority's conclusion that here the proponents of Proposition 77 substantially complied with the constitutional and statutory requirements that a copy of the proposed initiative be provided to the Attorney General before the proposal is circulated to the public for signatures. Like the trial court and the Court of Appeal, I conclude that to substantially comply with the constitutional and statutory provisions, a party wishing to circulate a proposed initiative must give the Attorney General a copy that does not differ in meaning from the version of the initiative circulated to the public for signatures. The purpose of these provisions is to furnish the Legislature, government offices and officials, as well as the electorate, with accurate information so they can make informed decisions. When, as here, the proposed initiative has two competing versions that differ in meaning, the goal of the constitutional and statutory provisions is undermined and the integrity of the electoral process is compromised.

## I.

Petitioners were the proponents of Proposition 77, an initiative measure that proposed changing the process for redistricting California's Senate, Assembly, congressional, and Board of Equalization districts. At the November 8, 2005, special election, the voters rejected the initiative. The question here, however, does not concern the defeat of the initiative, but whether the proposition should have been presented to the voters at all.

On December 7, 2004, the proponents started the initiative process by submitting to the Attorney General a version of the proposed initiative prepared on December 6 (the December 6 version). (Cal. Const., art. II, § 10, subd. (d); Elec. Code, § 9002.) That same day, Tricia Knight, the Attorney General's initiative coordinator, notified the proponents that any substantive amendments to the proposed initiative would have to be submitted within 15 days of the initial submission, that is, on or before December 22, 2004. The proponents did not present any amendments.

On February 3, 2005, Knight sent to the proponents, to the Secretary of State, and to the Chief Clerk of the Assembly, the title and summary prepared by the Attorney General as well as the December 6 version of the proposed initiative that the proponents had provided to the Attorney General.

The proponents then arranged for the printing of the initiative petition for circulation to the electorate to try to gather enough signatures to qualify the measure for the ballot. The printed petition contained the Attorney General's title and summary of the proposed initiative, but the version of the proposed initiative in the petition was not the same as the December 6 version that the proponents had submitted to the Attorney General. Instead, the petition contained an earlier draft of the proposed initiative, a draft dated December 3, 2004 (the December 3 version).

In mid-May 2005, the proponents learned that they had circulated to the electorate the wrong version of the proposed initiative. They did not, however, disclose that to the Secretary of State until June 13, 2005, after he had certified that the proposed initiative qualified for the ballot and so notified the Legislature's Assembly and Senate.

On July 8, 2005, the Attorney General brought this action for a writ of mandate to prohibit either version of the proposed initiative from being placed on the ballot. The trial court found that the error was the result of an inadvertent mistake. The court acknowledged the applicability of the legal doctrine of substantial compliance in limited situations involving the initiative process. It determined, however, that the proponents had not substantially complied with the constitutional and statutory requirements for qualifying a measure for the ballot. The differences between the proposed initiative submitted to the Attorney General and the version submitted to the public, the trial court said, "go to the substantive terms of the measure."

In a two-to-one decision, the Court of Appeal affirmed the trial court's judgment. On August 12, 2005, a majority of this court granted the proponents' petition for review, stayed the judgment of the trial court, and directed the Secretary of State to place the December 3 version of the initiative (the version included in the petition signed by the public) on the ballot for the November 8, 2005 election. The voters rejected the initiative.

## II.

The California Constitution reserves to the people the powers of initiative and referendum. (Cal. Const., art. IV, § 1.) "The initiative is the power of the electors to propose statutes and amendments to the Constitution and to adopt or reject them." (Cal. Const., art. II, § 8, subd. (a).) Of particular relevance here is this provision in the state Constitution: "Prior to circulation of an initiative or referendum petition for signatures, a *copy* shall be submitted to the Attorney General who shall prepare a title and summary of the measure as provided by law." (Cal. Const., art. II, § 10, subd. (d), italics added.) The Constitution further directs the Legislature to "provide the manner in which

petitions shall be circulated, presented, and certified, and measures submitted to the electors." (Cal. Const., art. II, § 10, subd. (e).) The Legislature has enacted a number of statutes implementing these provisions. (Elec. Code, § 9000 et seq.)

The constitutional and statutory requirement that the Attorney General be given a copy of a proposed initiative serves the objective of providing consistent, reliable information about the initiative to the Legislature, to certain government offices, to those who may want to comment on the proposal, and to the public. Accordingly, the Attorney General is required by law to prepare a title and summary of the document submitted (Elec. Code, §§ 9002, 9004); to give copies to the Department of Finance and Joint Legislative Budget Committee for preparation of cost estimates (*id.*, § 9005); and to send copies with the Attorney General's title and summary of the proposed initiative to the proponents, the Secretary of State, the Senate, and the Assembly (*id.*, §§ 9004, 9007). Based on the copy furnished by the Attorney General, either or both houses of the Legislature may hold public hearings on the measure. (*Id.*, § 9007.) The Attorney General's transmission of the summary of the "chief purposes and points" of the proposed initiative must be prepared within 15 days of the Attorney General's receipt of the final version of the proposed initiative or 15 days from receipt of the cost estimates from the Department of Finance and Joint Legislative Budget Committee, whichever is later. (*Id.*, § 9004.) The Attorney General's transmission of the summary triggers the official notification by the Secretary of State to the county election officials, and it starts the time during which the petition is circulated to the electorate for signatures to qualify the initiative for placement on the ballot. (*Id.*, § 336.) Each page of the petition must bear the Attorney General's summary. (*Id.*, § 9008.)

As the majority here observes, "there can be no question but that the relevant constitutional and statutory provisions require that the version of a measure submitted to the Attorney General by the measure's proponents prior to circulation of the petition be *the same version* of the initiative measure circulated for signature." (Maj. opn., *ante*, at pp. 1011–1012, italics added.) That the proponents failed to comply with this requirement is not in question. The majority acknowledges that the version of the proposed initiative submitted by the proponents to the Attorney General was *substantively different* from the version circulated to the public for signature gathering. (Maj. opn., *ante*, at pp. 1023–1024.)

Nevertheless, the majority concludes it was proper to place the initiative on the ballot because the proponents substantially complied with the purpose of the constitutional and statutory requirement that the Attorney General be given a copy of the proposed initiative. (Maj. opn., *ante,* at pp. 1025–1026.) The

purpose of this requirement, the majority says, includes ensuring "that all the relevant officials are 'on the same page.' " (Maj. opn., *ante*, at p. 1024.) The majority reasons that differences between the two versions were brought to the attention of public officials and opponents of the measure before the ballot materials were printed for distribution to the electorate, and the disparities were such that the public officials had adequate time to make revisions necessary "to reflect the version that was to be voted upon in the election." (Maj. opn., *ante*, at p. 1025.) I disagree.

With respect to initiatives, we measure substantial compliance by asking whether the failure to comply with the law frustrates the constitutional and statutory goal of giving the electorate pertinent information about the measure. (*Assembly v. Deukmejian* (1982) 30 Cal.3d 638, 652–653 [180 Cal.Rptr. 297, 639 P.2d 939].) In my view, there is no substantial compliance if the copy of the proposed initiative submitted to the Attorney General differs substantively from that circulated to the public for the gathering of signatures.

The copy of the proposed initiative that the proponents submit to the Attorney General is accepted and treated as the official version of the proposal. It is disseminated throughout the government at both the state and county levels and made generally available to the public as a public record. All who receive the text of the initiative through this process should be entitled to rely on its accuracy. When, as here, the text of an initiative that appears on the ballot differs substantively from the text furnished to the Attorney General, to the Legislature, to any affected party, and to the public, each loses the opportunity to fully assess the measure's impact at the time and in the manner contemplated by the state Constitution and the state election laws.[1]

When, as here, the Attorney General is given a copy of a proposed initiative that is different in substantive respects from the version that ultimately appears on the ballot, the Attorney General becomes the unwitting agent of misinformation by disseminating the variant text throughout state and local government and to the public. The effects of this misinformation are

---

[1] At the direction of the Court of Appeal, the Attorney General prepared a title and summary for the December 3 version of the initiative that did not materially differ from the title and summary prepared for the December 6 version. But the purpose of the constitutional and statutory requirement that the proponents of an initiative give the Attorney General a copy of the proposed initiative goes far beyond the preparation of a title and summary. The Attorney General's title and summary may not exceed 100 words and is limited to the "chief purpose and points" of the proposed initiative. (Elec. Code, § 9002.) As the Court of Appeal observed: "If the measure of substantial compliance is the adequacy of such a general summary to encompass both the submitted and circulated versions, an unlimited number of substantive changes not contained in the copy submitted to the Attorney General could be made to the circulating copy."

difficult to trace and quantify, but may well be profound. The inaccuracies in the variant text may influence groups and individuals specifically interested in the subject matter of the proposed initiative as they decide whether or not to endorse or oppose the measure, and it may lead them to make inaccurate public comments about how the measure will operate or what its likely impact will be. In turn, registered voters who sign petitions to place the measure on the ballot may be affected by the presence or absence of public comments endorsing or opposing the measure, or explaining its operation and effects. When the process of qualifying the initiative for the ballot is thus tainted at the outset by information that is incomplete or misleading, the basic integrity of the electoral process is placed at risk.

The Attorney General's inadvertent dissemination of misinformation about the initiative was exacerbated by the proponents' delay in notifying the Secretary of State of the differences between the version of the initiative that was submitted to the Attorney General and the one that was circulated to the public. The proponents submitted the proposed initiative to the Attorney General on December 7, 2004. In mid-May 2005, the proponents discovered that the version circulated to the public for signatures was different from the version they had given to the Attorney General. Yet they waited until June 13, 2005, before notifying the Secretary of State of their error. Both versions were judicially enjoined from being placed on the ballot until August 12, 2005, just three days before the contents of the voter information guide had to be received by the State Printer for printing and distribution to all of the approximately 12 million registered voters in California. When the existence of the two different versions finally became a matter of public knowledge, the confusion and uncertainty about which version, if either, would be placed on the ballot necessarily impaired the ability of interested parties to understand the measure and to debate its merits during a crucial preelection period.[2]

---

[2] The majority concedes that the differences between the two versions are substantive (maj. opn., *ante*, at p. 1024), but then attempts to characterize them as "relatively minor" when it concludes that public officials and others had enough time to comment on the version to be voted upon at the election (*id.* at p. 1025). Whether opponents, public officials, and others would consider the substantive discrepancies significant or minor, and if so, why, is a matter for them to decide for themselves as they determine what information to provide or arguments to make to the public. In any event, there are significant disparities between some of the major provisions in the two different versions involved here. The "Findings and Declarations of Purpose" differed. For example, the December 6 version added provisions in the findings and declarations more directly accusing incumbent legislators of conflicts of interest and asserting that retired judges are better suited to apportioning districts in California. The difference is potentially significant because such findings and declarations of purpose are critical consider-ations in determining the intent of the voters in adopting an initiative and thus may affect how its provisions are understood and construed when disputes later arise. (See *People ex rel. Lockyer v. R.J. Reynolds Tobacco Company* (2005) 37 Cal.4th 707, 716 [36 Cal.Rptr.3d 814, 124 P.3d 408]; *California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 15 [270 Cal.Rptr. 796].) In addition, the December 3 version of the proposed initiative stated that except

There is no need to so jeopardize the integrity of the electoral process. The constitutional and statutory mandate of providing a true copy to the Attorney General of what will be circulated to the electorate for signatures is readily and easily met. All any proponent of any initiative measure need do to satisfy this mandate is to read and compare both versions, a simple matter of proofreading. Moreover, the proponents had, after submitting to the Attorney General a copy of the proposed initiative, at least 15 days in which they could make any changes to the submitted text. (Elec. Code, § 9004.) As the trial court put it: "There is no good reason to put the courts in the position of having to decide what is good enough for qualifying an initiative measure for the ballot when actual compliance is easily attainable."

The Attorney General asserts that the doctrine of substantial compliance should apply here only if the differences between the copy of the initiative submitted to the Attorney General and the version circulated to the public for signature gathering do not effect a change in the meaning. I agree. The majority rejects that position, however, on the grounds that it would invalidate a circulated petition without regard to the significance or insignificance of the particular differences in meaning (maj. opn., *ante,* at pp. 1026–1027); that it would not tolerate "*any* departure" in meaning (*id.* at p. 1027); and that it would include "an inadvertent mistake in the printing of an insignificant numeral" (*ibid.*). The doctrine of substantial compliance, as urged by the Attorney General, is not as strict as the majority implies; it does allow insignificant differences, minor departures from legal requirements, and inadvertent mistakes, as long as they do not affect the meaning of the proposed initiative. (See *Assembly v. Deukmejian, supra,* 30 Cal.3d at p. 653; *California Teachers Assn. v. Collins* (1934) 1 Cal.2d 202 [34 P.2d 134].) When two versions of a proposed initiative differ in ways that change its meaning, however, as occurred here (see p. 1035, fn. 2, *ante*), the doctrine of substantial compliance should not apply, in light of the significant risk of confusing or misleading the public. (See *Boyd v. Jordan* (1934) 1 Cal.2d 468 [35 P.2d 533].)

Citing prior decisions involving court comparisons of titles and summaries of proposed initiatives to substantive provisions of the measures, the majority asserts that the courts are quite capable of determining whether variances in different versions of a proposed initiative pose a realistic danger of misleading the electorate. (Maj. opn., *ante,* at p. 1028.) The issue here, however, does

---

for judicial decrees its provisions are the exclusive means of adjusting boundaries. The December 6 version added to this statement language saying that the initiative and referendum powers reserved to the people in article II of the state Constitution could be used only as specified in the proposed measure itself. The December 3 version could well be read as allowing modification of the measure by future initiatives independent of the terms of the measure itself, while the December 6 version cannot. In my view, a difference that may restrict the people's reserved initiative and referendum powers by barring their use to modify a constitutional provision is not "relatively minor."

not involve an inaccurate title or summary; instead, it involves separate versions, differing in meaning, of the very text of the initiative. Moreover, the inquiry goes beyond whether the voters may have been misled in the voting booths. Also to be considered are the consequences of furnishing different versions of the proposed initiative to the Legislature and to the public. Given the narrow timeframe for a preelection challenge, how can a court accurately determine that differences in meaning in the two versions could not have affected decisions within the legislative branch about whether or not to hold hearings, the form and content of such hearings, and whether to propose or enact legislation addressing the same subject? And, given the narrow time-frame, how can a court reliably determine that the differences in meaning in the two versions were not significant to any organization, group, or prominent individual in taking an early stand for or against the proposed initiative measure, or refraining from taking a stand? Inaccurate information about the meaning of a proposed initiative, widely and officially disseminated at an early stage of the political process, when key judgments are being made about whether to support or oppose the initiative, and about how to frame the public debate concerning it, can subtly alter the entire electoral process and thereby compromise its integrity.[3]

Misplaced is the majority's reliance on *MHC Financing Limited Partnership Two v. City of Santee* (2005) 125 Cal.App.4th 1372 [23 Cal.Rptr.3d 622] as support for a contrary conclusion. There, unlike here, the court addressed the issue in the context of a postelection challenge to an initiative that was never submitted to the electorate. Here, we are concerned with preelection challenges and whether, when similar situations arise in the future, proposed initiatives should be submitted to the electorate for a vote.[4]

Preelection judicial review of challenges to initiative matters, as the majority recognizes, presents issues and concerns different from those in-volved in postelection review. In particular, an election may render moot a

---

[3] The majority also asserts that a rule barring submission of an initiative to the voters because of substantive disparities between the two versions of the initiative could compel a court to withhold from an election a "universally popular and urgently needed 'good government' constitutional initiative." (Maj. opn., *ante*, at p. 1027.) The rule could equally serve to withhold from an election a highly undesirable initiative measure. The majority's argument is unsound, because the rule of substantial compliance does not, and should not, depend on the court's view of the desirability of the initiative. Indeed, the majority's comment highlights a major disadvantage of its approach—the risk that, with a vague and subjective substantial compliance standard, inappropriate considerations will actually influence a court's substantial compliance determination, or that the public will perceive the court to be so influenced.

[4] Although the filing of this case occurs *after* the November 2005 election, we decide this case in the context of preelection review because the issue being resolved is whether the Court of Appeal and trial court erred in enjoining the initiative from being placed on the ballot before the election.

challenge to an initiative based on failure to comply with procedural requirements of the initiative process. (Maj. opn., *ante*, at p. 1007.) In addition, the Court of Appeal in *MHC Financing* assumed that the only purpose of the requirement of Elections Code section 9203 that a proposed local initiative be submitted to the local election official (there, the city clerk) was for preparation of a summary and title by the city attorney. (*MHC Financing Limited Partnership Two v. City of Santee, supra*, 125 Cal.App.4th at p. 1391.) As we have seen (*ante*, p. 1034 & fn. 1), the constitutional directive that the proponents of a statewide initiative submit a copy to the Attorney General serves many purposes in addition to preparation of a summary and title for the initiative.

### III.

The state Constitution and the implementing statutory provisions require that the proponents of a proposed statewide initiative, before circulating it for signatures, give a copy of its text to the Attorney General, who then prepares a title and summary of the initiative and distributes the text of the measure to various government offices and officials and to interested members of the public. This requirement serves the crucial purpose of establishing the official text of the initiative so that its merits may be carefully and accurately examined and debated within the Legislature and in other public forums during a period of months leading up to the election at which the initiative will appear on the ballot. When this clear and easily satisfied directive is breached, and misinformation about the initiative's meaning is inadvertently disseminated at the outset of the campaign, the inevitable result is distortion of the public debate on the initiative and compromise of the electoral process.

I would affirm the judgment of the Court of Appeal and hold that when, as here, the copy of the proposed initiative submitted by its proponents to the Attorney General differs in meaning from the version circulated to the electorate for signatures, the measure should not be placed on the ballot.

Moreno, J., concurred.

**WERDEGAR, J.,** Concurring and Dissenting.—I concur in the judgment dismissing the case as moot. As the majority acknowledges, the applicable rules of law generally do not permit us to invalidate an initiative measure the voters have adopted on account of procedural errors in the measure's qualification that are not claimed to have affected the fairness of the vote. (See maj. opn., *ante*, at p. 1007.) Consequently, the court's order of August 12, 2005, placing Proposition 77 on the ballot—a ruling in which I did not participate—rendered the case moot as a practical matter even before the voters rejected the initiative. Language in the August 12 order purporting to reserve

jurisdiction to decide the case after the election could not and did not change the rule against granting postelection relief on preelection procedural grounds. Because the matter is moot, I do not join in the majority's extensive obiter dicta on the question whether the court's August 12 ruling was correct.

## Appendix

The following sets forth the differences between the December 6 and December 3 versions of the initiative measure. The language of the December 3 version that the December 6 version proposed to delete is set forth in double-underlined type. The language that the December 6 version proposed to add is set forth [in bold type in brackets]. The *preexisting language of article XXI, section 1 of the California Constitution that both versions proposed to delete is set forth in ~~strikethrough~~ type.*

### PROPOSED LAW

### REDISTRICTING REFORM: THE VOTER EMPOWERMENT ACT

SECTION 1. Findings and Declarations of Purpose

The People of the State of California find and declare that:

(a) Our Legislature should be responsive to the demands of the citizens of the State of California, and not the self-interest of individual legislators or the partisan interests of political parties.

(b) Self-interest and partisan gerrymandering have resulted in uncompetitive districts, ideological polarization in our institutions of representative democracy, and a disconnect between the interests of the People of California and their elected representatives.

(c) The redistricting plans adopted by the California Legislature in 2001 serve incumbents, not the People, are repugnant to the People, and are in direct opposition to the People's interest in fair and competitive elections. They should not be used again.

(d) We demand that our representative system of government be fair to all, open to public scrutiny, free of conflicts of interest, and dedicated to the principle that government derives its power from the consent of the governed. Therefore, the People of the State of California hereby adopt the "Redistricting Reform: The Voter Empowerment Act."

[(a) Our Legislature should be responsive to the demands of the voters, but existing law places the power to draw the very districts, in which legislators are elected, in the hands of incumbent state legislators, who then choose their voters, which is a conflict of interest.

(b) The Legislature's self-interest in drawing its members' districts has resulted in partisan gerrymandering, uncompetitive districts, ideological polarization, and a growing division between the interests of the People of California and their elected representatives.

(c) The redistricting plans adopted by the California Legislature in 2001 produced an unprecedented number of uncompetitive districts, serve incumbents and not the People, and are repugnant to the People. The gerrymandered districts of 2001 resulted in not a single change in the partisan composition of the California Legislature or the California congressional delegation in the 2004 elections. These districts should be replaced as soon as possible and never used again.

(d) The experience of the 1970's and 1990's demonstrates that impartial special masters, who are retired judges independent of partisan politics and the Legislature, can draw fair and competitive districts by virtue of their judicial training and judicial temperament.

(e) We demand that our representative system of government assure that the voters choose their representatives, rather than their representatives choose their voters, that it be open to public scrutiny and free of conflicts of interest, and that the system embody the principle that government derives its power from the consent of the governed. Therefore, the People of the State of California hereby adopt the "Redistricting Reform: The Voter Empowerment Act."]

SECTION 2. Fair Redistricting
Article XXI of the California Constitution is amended to read:

SECTION 1. (a) Except as provided in subdivision (b), in the year following the year in which the national census is taken under the direction of Congress at the beginning of each decade, a panel of Special Masters composed of retired judges shall adjust the boundary lines of the Senatorial, Assembly, Congressional, and Board of Equalization districts in accordance with the standards and provisions of this article.

(b) Within 20 days following the effective date of this section, the Legislature shall appoint, pursuant to the provisions of subdivision (c)(2), a panel of Special Masters to adopt a plan of redistricting adjusting the boundary lines of the Senatorial, Assembly, Congressional, and Board of Equalization districts for use in the next set of statewide primary and general elections and until the next adjustment of boundary lines is required pursuant to subdivisions (a) or (i) [this article]. **The panel shall establish a schedule**

**and deadlines to ensure timely adoption of the plan. Except for subdivision (c)(1), all provisions of this article shall apply to the adoption of the plan required by this subdivision.**

(c)(1) Except as provided in subdivision (b), on or before January 15 of the year following the year in which the national census is taken, the Legislature shall appoint, pursuant to the provisions of subdivision (c)(2), a panel of Special Masters composed of retired judges to adopt a plan of redistricting adjusting the boundary lines of the Senatorial, Assembly, Congressional, and Board of Equalization districts pursuant to this article.

(2)(A) In sufficient time to allow the appointment of the Special Masters, the Judicial Council shall nominate [select] **by lot 24 retired judges willing to serve as Special Masters. Only retired California state or federal judges, who have never held elected partisan public office or political party office, have not changed their party affiliation, as declared on their voter registration affidavit, since their initial appointment or election to judicial office, and have not received income during the past 12 months from the Legislature, a committee thereof, the United States Congress, a committee thereof, a political party, or a partisan candidate or committee controlled by such candidate, are qualified to serve as Special Master** [Special Masters]. Not more than 12 of the 24 retired judges may be of a single party affiliation, and the two largest political parties in California shall be equally represented among the nominated retired judges.

(B) A retired judge selected [appointed] to serve as a Special Master shall also pledge, in writing, that he or she will not run for election in the Senatorial, Assembly, Congressional, or Board of Equalization districts adjusted by him or her pursuant to this article nor accept, for at least five years from the date of appointment as a Special Master, California state public employment or public office, other than judicial employment or judicial office or a teaching position.

(C) From the pool of retired judges nominated [selected] by the Judicial Council, the Speaker of the Assembly, the Minority Leader of the Assembly, the President pro Tempore of the Senate, and the Minority Leader of the Senate shall each nominate, no later than five [six] days before the deadline for appointment of the panel of Special Masters, three retired judges, who are not registered members of the same political party as that of the legislator making the nomination. No retired judge may be nominated by more than one legislator.

(D) If, for any reason, any of the aforementioned legislative leadership fails to nominate the requisite number of retired judges within the time period

specified herein, the Chief Clerk of the Assembly shall immediately draw, by lot, that legislator's remaining nominees in accordance with the requirements of subdivision (c)(2)(c).

(E) No later than three [**four**] days before the deadline for appointment of the panel of Special Masters, each legislator authorized to nominate a retired judge shall also be entitled to exercise a single peremptory challenge striking the name of any nominee of any other legislator.

(F) From the list of remaining nominees selected by said legislative leadership, the Chief Clerk of the Assembly shall then draw, by lot, three persons to serve as Special Masters. If the drawing fails to produce at least one Special Master from each of the two largest political parties, the drawing shall be conducted again until this requirement is met. If the drawing is unable to produce at least one Special Master from each of the two largest political parties, the drawing for the Special Master from the political party not represented from the list of remaining nominees shall be made from the original pool of 24 retired judges nominated [**If said list of remaining nominees does not include a retired judge from each of the two largest political parties, the drawing for the Special Master from the absent political party or parties shall be made from the original pool of twenty-four retired judges selected**] by the Judicial Council, except that no retired judge whose name was struck pursuant to subdivision (c)(2)(E) may be appointed. In the event of a vacancy in the panel of Special Masters, the Chief Clerk shall immediately thereafter draw, by lot, from the list of remaining nominees selected by said legislative leadership, or the original pool of 24 retired judges, if necessary, except for those whose names were struck, a replacement who satisfies the composition requirements for the panel under this subdivision.

(d) Each Special Master shall be compensated at the same rate for each day engaged in official duties and reimbursed for actual and necessary expenses, including travel expenses, in the same manner as a member of the California Citizens Compensation Commission pursuant to subdivision (j) of Section 8 of Article III. The Special Masters' term of office shall expire upon approval or rejection of a plan pursuant to subdivision (h).

(e) Each Special Master shall be subject to the same restrictions on gifts as imposed on a retired judge of the superior court serving in the assigned judges program, and shall file a statement of economic interest, or any successor document, to the same extent and in the same manner as such a retired judge.

(f)(1) Public notice shall be given of all meetings of the Special Masters, and the Special Masters shall be deemed a state body subject to the

provisions of the Bagley-Keene Open Meeting Act (Government Code §§ 11120–11132), or any successor act, as amended from time to time; provided that all meetings and sessions of the Special Masters shall be recorded. The Special Masters shall establish procedures that restrict ex parte communications from members of the public and the Legislature concerning the merits of any redistricting plan.

(2) The panel of Special Masters shall establish and publish a schedule to receive and consider proposed redistricting plans and public comment from any member of the Legislature or public. The panel of Special Masters shall hold at least three public hearings throughout the state to consider redistricting plans. At least one such hearing shall be held after the Special Masters have submitted their proposed redistricting plan pursuant to subdivision (f)(3) but before adoption of the final plan.

(3) Before the adoption of a final redistricting plan, the Special Masters shall submit their plan to the Legislature for an opportunity to comment within the time set by the Special Masters. The Special Masters shall address in writing each change to their plan that is recommended by the Legislature and incorporated into the plan.

(g) The final redistricting plan shall be approved by a single resolution adopted unanimously by the Special Masters and shall become effective upon its filing with the Secretary of State for use at the next statewide primary and general elections, and, if adopted by initiative pursuant to subdivision (h), **[shall remain effective] for succeeding elections until the next adjustment of boundaries is required pursuant to this article.**

(h) The Secretary of State shall submit the final redistricting plan as if it were proposed as an initiative statute under Section 8 of Article II at the same next general election provided for **[as specified]** under subdivision (g) for approval or rejection by the voters for use in succeeding elections until the next adjustment of boundaries is required. The ballot title shall read: "Shall the boundary lines of the Senatorial, Assembly, Congressional, and Board of Equalization districts adopted by Special Masters as required by Article XXI of the California Constitution. and used for this election, be used until the next constitutionally required adjustment of the boundaries?"

(i) If the redistricting plan is approved by the voters pursuant to subdivision (h), it shall be used in succeeding elections until the next adjustment of boundaries is required. If the plan is rejected by the voters pursuant to subdivision (h), a new panel of Special Masters shall be appointed within 90 days in the manner provided in subdivision (c)(2), for the purpose of proposing a new plan for the next statewide primary and general elections

pursuant to this article. Any officials elected under a final redistricting plan shall serve out their term of office notwithstanding the voters' disapproval of the plan for use in succeeding primary and general elections.

(j) The Legislature shall make such appropriations from the Legislature's operating budget, as limited by Section 7.5 of Article IV, as necessary to provide the panel of Special Masters with equipment, office space, and necessary personnel, including counsel and independent experts in the field of redistricting and computer technology, to assist them in their work. The Legislative Analyst shall determine the maximum amount of the appropriation, based on one-half the amount expended by the Legislature in creating plans in 2001, adjusted by the California Consumer Price Index. For purposes of the plan of redistricting under subdivision (b) only, there is hereby appropriated to the panel of Special Masters from the General Fund of the State during the fiscal year in which the panel performs its responsibilities a sum equal to one-half the amount expended by the Legislature in creating plans in 2001. The expenditure of funds under this appropriation shall be subject to the normal administrative review given to other state appropriations. For purposes of all plans of redistricting under subdivision (a), until appropriations are made, the Legislative Analyst's Office, or any successor thereto, shall furnish, from existing resources, staff and services to the panel as needed for the performance of its duties.

(k) Except for judicial decrees, the provisions of this article are the exclusive means of adjusting the boundary lines of the districts specified herein[, **and the powers under Sections 8 and 9 of Article II shall be used only in the manner specified in subdivisions (g) and (h) herein**].

Section 2. (a) Each member of the Senate, Assembly, Congress, and the Board of Equalization shall be elected from a single-member district. Districts of each type shall be numbered consecutively commencing at the northern boundary of the State and ending at the southern boundary.

(b) The population of all districts of a particular type shall be as nearly equal as practicable. For congressional districts, the maximum population deviation between districts shall not exceed federal constitutional standards. For state legislative and Board of Equalization districts, the maximum population deviation between districts of the same type shall not exceed one percent or any stricter standard required by federal law.

(c) Districts shall comply with any additional requirements of the United States Constitution and any applicable federal statute, including the federal Voting Rights Act.

(d) Each Board of Equalization district shall be comprised of 10 adjacent Senate districts and each Senate district shall be comprised of two adjacent Assembly districts.

(e) Every district shall be contiguous.

(f) District boundaries shall conform to the geographic boundaries of a county, city, or city and county to the greatest extent practicable. In this regard, a redistricting plan shall comply with these criteria in the following order of importance: (1) create the most whole counties possible, (2) create the fewest county fragments possible, (3) create the most whole cities possible, and (4) create the fewest city fragments possible, except as necessary to comply with the requirements of the preceding subdivisions of this section.

(g) Every district shall be as compact as practicable except to the extent necessary to comply with the requirements of the preceding subdivisions of this section. With regard to compactness, to the extent practicable a contiguous area of population shall not be bypassed to incorporate an area of population more distant.

(h) No census block shall be fragmented unless required to satisfy the requirements of the United States Constitution.

(i) No consideration shall be given as to the potential effects on incumbents or political parties. No data regarding the residence of an incumbent or of any other candidate or the party affiliation or voting history of electors may be used in the preparation of plans, except as required by federal law.

Section 3. Any action or proceeding alleging that a plan adopted by the Special Masters does not conform with the requirements of this article must be filed within 45 days of the filing of the plan with the Secretary of State or such action or proceeding is forever barred. Judicial review of the conformity of any plan with the requirements of this article may be pursuant to a petition for extraordinary relief. If any court finds a plan to be in violation of this article, it may order that a new plan be adopted by a panel of Special Masters pursuant to this article. A court may order any remedy necessary to effectuate this article.

~~In the year following the year in which the national census is taken under the direction of Congress at the beginning of each decade, the Legislature shall adjust the boundary lines of the Senatorial, Assembly, Congressional, and Board of Equalization districts in conformance with the following standards:~~

(a) Each member of the Senate, Assembly, Congress, and the Board of Equalization shall be elected from a single-member district.

(b) The population of all districts of a particular type shall be reasonably equal.

(c) Every district shall be contiguous.

(d) Districts of each type shall be numbered consecutively commencing at the northern boundary of the state and ending at the southern boundary.

(e) The geographical integrity of any city, county, or city and county, or of any geographical region shall be respected to the extent possible without violating the requirements of any other subdivision of this section.

SECTION 3. Severability

If any provision of this measure or the application thereof to any person or circumstance is held invalid, including, but not limited to, subdivision (b) of Section 1 of Article XXI, that invalidity shall not affect other provisions or applications which can reasonably be given effect in the absence of the invalid provision or application.

SECTION 4. Conflicting Ballot Measures

(a) In the event that this measure and another measure or measures relating to the redistricting of Senatorial, Assembly, Congressional, or Board of Equalization districts is approved by a majority of voters at the same election, and this measure receives a greater number of affirmative votes than any other such measure or measures, this measure shall control in its entirety and said other measure or measures shall be rendered void and without any legal effect. If this measure is approved but does not receive a greater number of affirmative votes than said other measure or measures, this measure shall take effect to the extent permitted by law.

(b) If this measure is approved by voters but superseded by law by any other conflicting ballot measure approved by the voters at the same election, and the conflicting ballot measure is later held invalid, this measure shall be self-executing and given full force of law.